# In the United States Court of Federal Claims

No. 18-972C

(Filed:  April 8, 2019)

| | |
|---|---|
| **************************************** ) | |
| **BP EXPLORATION &** ) | Suit for leasehold royalty overpayments |
| **PRODUCTION, INC.,** ) | and interest; jurisdiction; Federal Oil and |
| ) | Gas Royalty Management Act, 30 U.S.C. |
| Plaintiff, ) | §§ 1701-59, as amended by the Federal Oil |
| ) | and Gas Royalty Simplification and |
| v. ) | Fairness Act; jurisdiction under the Tucker |
| ) | Act for a monetary claim; 28 U.S.C. § |
| **UNITED STATES**, ) | 1491(a) not displaced by 30 U.S.C. § |
| ) | 1724(h)(2)(B) for a monetary claim; |
| Defendant, ) | contractual remedy for refund and interest |
| ) | supplanted by the statutory remedial |
| **************************************** ) | scheme; takings claim for accrued interest |

Jonathan A. Hunter and Sarah Y. Dicharry, Jones Walker, LLP, New Orleans, Louisiana, for plaintiff.

Tanya B. Koenig, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant.  With her on the briefs were Joseph H. Hunt, Assistant Attorney General, Civil Division, and Robert E. Kirschman, Jr., Director, and Allison Kidd-Miller, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.  Of counsel was Joseph D. Coleman, Attorney-Advisor, Rocky Mountain Regional Solicitor's Office, United States Department of the Interior, Lakewood, Colorado.

**OPINION AND ORDER**

LETTOW, Senior Judge.

Plaintiff BP Exploration & Production, Inc. ("BP") has brought suit against the United States (the "government") acting through the Department of the Interior's (the "Department's") Office of Natural Resources Revenue ("ONRR") to recover overpayments of royalties made to the government between 2004 and 2007 pursuant to lease agreements on several oil and gas leases in the Gulf of Mexico.  The government refunded some, but not all, of the overpaid royalties claimed by BP and refused to pay interest on the amount refunded.

BP seeks $1,536,785 plus interest for royalty overpayments denied by ONRR.  Compl. ¶¶ 28, 33-34.  In addition, BP seeks interest on the approximately $6.5 million in royalties that ONRR refunded to BP pursuant to an administrative decision rendered in December 2017.  Compl. ¶¶ 14, 18, 28-29, 42-43.  In its complaint, BP advances four claims against the government.  Count I asserts that ONRR owes BP $1,536,785 for royalty overpayments, Compl. ¶¶ 33-35, and Count II avers that ONRR owes BP interest on both the $1,536,785 in unrefunded

overpayments and on the approximately $6.5 million in refunded overpayments, Compl. ¶ 42. Counts I and II arise under money-mandating provisions of the Federal Oil and Gas Royalty Management Act of 1982 ("Royalty Management Act"), Pub. L. No. 97-451, 96 Stat. 2447 (codified at 30 U.S.C. §§ 1701-59), as amended by the Federal Oil and Gas Royalty Simplification and Fairness Act of 1996 ("Royalty Simplification Act"), Pub. L. No. 104-185, 110 Stat. 1700 (1996). Compl. ¶¶ 35, 43. Count III alleges that ONRR breached its leases and tolling agreements with BP by refusing to refund overpayments and interest. Compl. ¶¶ 45-47. Count IV claims that ONRR has taken accrued interest owed to BP in violation of the Takings Clause of the Fifth Amendment. Compl. ¶ 52.

The government has moved to dismiss the complaint pursuant to Rules 12(b)(1) and (6) of the Rules of the Court of Federal Claims ("RCFC"). Def.'s Mot. to Dismiss Pl.'s Compl. ("Def.'s Mot."), ECF No. 10. The issues have been fully briefed, *see* Pl.'s Opp'n to Def.'s Mot. to Dismiss ("Pl.'s Opp'n"), ECF No. 13; Def.'s Reply in Supp. of its Mot. to Dismiss Pl.'s Compl. ("Def.'s Reply"), ECF No. 18, and the court held a hearing on February 26, 2019.

The court concludes that it possesses jurisdiction to hear claims for refunds and interest denied by the government under the Royalty Management Act. Accordingly, the government's motion to dismiss the complaint for lack of subject-matter jurisdiction is denied. In other respects, unresolved legal and factual issues mean that BP may well have stated a claim upon which relief can be granted, although the remedial scheme of the Royalty Management Act limits the types of claims that can be brought. As a result, the government's motion to dismiss for failure to state a claim upon which relief can be granted is granted in part and denied in part.

## BACKGROUND

### A. *ONRR's Audit of BP's Royalty Payments*

BP leases several oil and gas fields in the Gulf of Mexico from the government, and BP owes royalties to the government based on the value of oil and gas produced from the leased fields. Compl. ¶ 1. BP may deduct transportation costs from the value of oil and gas produced, thus reducing the royalties owed. Compl. ¶¶ 8-11, Ex. 1 at 2.[1] Deductible transportation costs include those incurred for the "construction, operation, and maintenance of non-arm's-length transportation facilities," *i.e.*, where BP owns the transportation infrastructure. Compl. ¶ 11, Ex. 1 at 6; *see also* Hr'g Tr. at 29:9 to 30:3 (Feb. 26, 2019).[2]

Royalty obligations are governed by the Royalty Management Act, 30 U.S.C. §§ 1701-59, which establishes obligations for leases executed on federal lands. Amendments by the Royalty Simplification Act in 1996 added, among other things, procedures for conducting audits

---

[1]Exhibit 1 to the Complaint consists of a copy of the ONRR Director's decision of December 11, 2017, regarding BP's royalty appeal, *BP Expl. & Prod. Co.*, ONRR-14-0020-OCS, 2017 WL 10662077, at *1 (Dec. 11, 2017). Citations to Exhibit 1 refer to the page numbering assigned by the court's electronic case filing system and not to the page number of the decision.

[2]Subsequent references to the transcript of the hearing will omit the date.

and requesting corrections of overpayments and underpayments, as well as a limitation on time for the Department of the Interior to issue a final decision on demands made by lessees.  The Royalty Simplification Act also allowed lessees to recover interest on refunds of overpayments, although the provision authorizing interest was repealed in 2015 by the Fixing America's Surface Transportation Act of 2015 ("FAST Act"), Pub. L. No. 114-94, Div. C, Title XXXII, § 32301, 129 Stat. 1312 (Dec. 4, 2015).

On February 7, 2009, ONRR commenced an audit of calculations of costs claimed by BP for transporting oil and gas through BP's Na Kika subsea complex.  Compl. ¶ 8, Ex. 1 at 4-5. The audit covered royalties owed between January 1, 2004, and December 31, 2007.  Compl. ¶ 10, Ex. 1 at 5.  Because BP employed the same methodology to calculate transportation costs for the Na Kika complex as it used for its other Gulf of Mexico leases, ONRR intended to carry over audit findings for that complex to other BP leases (collectively, the "Deepwater Properties"). Compl. Ex. 1 at 5; *see also* Compl. ¶¶ 15-16 (showing dates covered by BP's refund request).[3] The Deepwater Properties included the Holstein property, but excluded the Mad Dog and Mica properties.  *See* Compl. Ex. 3 (fourth tolling agreement, which covered the Na Kika complex and Deepwater Properties and listed covered properties); *see also* Compl. Ex 1 at 6, 9.

The Royalty Management Act imposes limitations on the periods in which the government and BP may seek corrections to past royalty payments.  *See* 30 U.S.C. §§ 1721a(a)(4) (adjustment period),[4] 1724(b)(1) (limitation period).[5]  The Royalty Management Act

---

[3]ONRR contends that BP agreed to carry over audit findings, Compl. Ex. 1 at 4-5, although BP's appeal of ONRR's decision to the Department of Interior's Board of Land Appeals contested this point, Compl. Ex. 5 at 7-8.

[4]Paragraph 1721a(a)(4) provides:

(4) For purposes of this section, the adjustment period for any obligation shall be the six-year period following the date on which an obligation became due. The adjustment period shall be suspended, tolled, extended, enlarged, or terminated by the same actions as the limitation period in section 1724 of this title.

30 U.S.C. § 1721a(a)(4).

[5]Subsection 1724(b) provides:

(b) Limitation period

(1) In general
   *A judicial proceeding or demand* which arises from, or relates to an obligation, *shall be commenced within seven years from the date on which the obligation becomes due* and if not so commenced shall be barred.  If commencement of a judicial proceeding or demand for an obligation is barred by this section, the Secretary, a delegated State, or a lessee or its designee (A) shall not take any other or further action regarding that

allows the government and a lessee to toll the period by written agreement.  30 U.S.C. § 1724(d); *see also id.* § 1721a(a)(4).  BP and ONRR executed a series of seven tolling agreements from 2010 to 2014.  Compl. Ex. 1 at 5.  The first tolling agreement, executed on November 19, 2010, tolled the periods for the Na Kika properties from November 30, 2010, through December 31, 2011.  Compl. Ex. 1 at 5.  The second agreement covered the Na Kika and Deepwater Properties from February 28, 2011, through December 31, 2011.  Compl. Ex. 1 at 5.  The third, fourth, and fifth agreements tolled the periods for both the Na Kika and Deepwater Properties through February 15, 2014.  Compl. Ex. 1 at 5; *see also* Compl. Ex. 3.  The sixth and seventh agreements tolled the periods for the separate Mad Dog property from May 31, 2013, to February 15, 2014.  Compl. Ex. 1 at 5.  In sum, the agreements tolled 1,173 days for the Na Kika complex, 1,083 days for the Deepwater Properties, and 260 days for the Mad Dog property.  Compl. Ex. 1 at 9.

On July 13, 2013, ONRR notified BP by e-mail that it was closing the audit of the Na Kika complex.  Compl. Ex. 1 at 7.  ONRR issued its final audit report on November 18, 2013, Compl. Ex. 1 at 8, although ONRR continued to ask BP questions pertaining to the audit into 2014, and BP alleges the audit did not actually end until 2014.  *See* Compl. Ex. 1 at 14, Ex. 5 at 8.

During the audit, BP identified allowable transportation costs for months covered by the audit that it had not previously deducted.  Compl. ¶ 11, Ex. 1 at 7.  BP subsequently submitted two requests for refunds to ONRR.  On November 13, 2013, BP requested $6,955,581.89 plus interest for royalty overpayments for January 2004 through August 2007 for the Na Kika and

---

       obligation, including (but not limited to) the issuance of any order, request, demand or other communication seeking any document, accounting, determination, calculation, recalculation, payment, principal, interest, assessment, or penalty or the initiation, pursuit or completion of an audit with respect to that obligation; and (B) shall not pursue any other equitable or legal remedy, whether under statute or common law, with respect to an action on or an enforcement of said obligation.

    (2) Rule of construction
       A judicial proceeding or demand that is timely commenced under paragraph (1) against a designee shall be considered timely commenced as to any lessee who is liable pursuant to section 1712(a) of this title for the obligation that is the subject of the judicial proceeding or demand.

    (3) Application of certain limitations
       The limitations set forth in section 2401, 2415, 2416, and 2462 of Title 28 and section 226-2 of this title shall not apply to any obligation to which this chapter applies.  Section 3716 of Title 31 may be applied to an obligation the enforcement of which is not barred by this chapter, but may not be applied to any obligation the enforcement of which is barred by this chapter.

30 U.S.C. § 1724(b) (emphasis added).

Holstein properties. Compl. ¶ 15, Ex. 1 at 7-8. On February 12, 2014, BP requested $6,619,730.51 plus interest for royalty overpayments for January 2004 through December 2007 for some Deepwater Properties, including additional requests for the Holstein property. Compl. ¶ 16, Ex. 1 at 8. The second request also sought refunds attributable to the Mad Dog and Mica properties. Compl. ¶ 16, Ex. 1 at 8.[6]

In February and June 2014, ONRR partially granted BP's refund requests, refunding BP $5,556,497.32 of the $13,575,312.40 claimed, plus interest. Compl. ¶¶ 14, 18. ONRR concluded that the tolling agreements only operated in favor of the government's claims for underpayments, and, applying the period specified in 30 U.S.C. § 1724(b), held that BP could only request refunds for overpayments within seven years of its request. Compl. ¶ 18. ONRR accordingly denied refunds for months more than seven years from the dates of BP's requests. Regarding BP's November 2013 claim covering the Na Kika and Holstein properties, ONRR granted refunds for October 2006 through August 2007, but rejected refunds covering January 2004 through September 2006. *See* Compl. Ex. 1 at 8. Regarding BP's February 2014 claim for the Deepwater, Holstein, Mad Dog, and Mica properties, ONRR granted refunds for January 2007 through December 2007, but rejected refunds for January 2004 through December 2006. Compl. Ex. 1 at 8. BP appealed the decision to the ONRR Director on October 17, 2014. Compl. ¶ 19.

### B.  *ONRR Director's Decision on BP's Appeal of the Audit*

The ONRR Director granted BP partial relief some three years later. Although the decision of December 11, 2017 provided a net benefit for BP, the Director denied some of the relief sought and reversed some of the relief granted by the initial decision. First, the Director held that the tolling agreements did apply bilaterally. Compl. Ex. 1 at 10-11. Next, the ONRR Director found that the applicable deadline for requests was the six-year "adjustment period" of 30 U.S.C. § 1721a(a) and not seven-year "limitation period" of 30 U.S.C. § 1724(b)(1). Compl. Ex. 1 at 10-14. The ONRR Director reasoned that adopting the seven-year limitation period would render "superfluous" the six-year adjustment period, the latter of which altered for refunds the general seven-year rule. Compl. Ex. 1 at 11-13. He ruled that a lessee may not seek a refund outside of the adjustment period unless requested during an ongoing audit. Compl. Ex. 1 at 12; *see also* 30 U.S.C. § 1721a(a)(4). The Director further concluded that BP's demands of November 2013 and February 2014 occurred after the audit closed in July 2013, and that the government's requests for information after July 2013 were merely to verify information provided by BP. Compl. Ex. 1 at 13-14. Accordingly, applying the six-year period and the tolling agreements, ONRR found that the first five months for Na Kika request, first nine months of the 2013 Holstein request, and first 12 months of the Deepwater Properties request (to include claims made in 2014 for the Holstein property) remained ineligible for refund. *See* Compl. Ex. 1. The remaining months previously excluded were now deemed eligible, and the ONRR

---

[6]BP also mentions that the Atlantis property was among those included in the February 2014 refund request. Compl. ¶ 16. Atlantis, however, does not appear among the Deepwater Properties listed in the fourth tolling agreement, *see* Compl. Ex. 3, and ONRR's refund decisions do not mention this property as among those excluded from the refund, *see* Compl. Ex. 1 at 8, 15-16. Much like the property's fabled namesake, the status of the Atlantis property remains unknown.

Director granted a refund of an additional $6,736,368, leaving $1,282,447 not refunded. *See* Compl. ¶¶ 14, 18, 28.[7]

The ONRR Director, however, found that $254,338 of the initial refund was improper and had to be returned to the government. *See* Compl. ¶ 28, Ex. 1 at 16-17. Specifically, $188,821 for the Mad Dog property and $65,517 for the Mica property should not have been refunded. Compl. ¶ 28, Ex. 1 at 16-17. The Mica property was not covered by the tolling agreement and the request was thus untimely, while the Mad Dog property's tolling agreement only covered the latter nine months of 2007 and not the 12 months refunded. Compl. ¶ 28, Ex. 1 at 16-17. Notably, however, had ONRR applied the seven-year limitation period urged by BP, the $1,282,447 not refunded and the $254,338 BP had to return would have been timely. *See also* Compl. Ex. 1 at 10.

Finally, the ONRR Director denied interest on the additional $6.5 million refunded to BP pursuant to the appeal. Compl. ¶ 28. While BP's appeal was pending before the Director, Congress had enacted the FAST Act on December 4, 2015, amending 30 U.S.C. § 1721 by removing the requirement for ONRR to pay interest on overpayments refunded to lessees. FAST Act, Pub. L. No. 114-94, § 32301, 129 Stat. at 1741; *see also* 30 U.S.C. § 1721(h) (2012). ONRR reasoned that this statutory change barred interest on refunds granted after enactment, even if the refund request was made, and interest had accrued, prior to enactment of the FAST Act. Compl. Ex. 1 at 14-15.

BP appealed the ONRR Director's decision to the Interior Board of Land Appeals ("Board of Land Appeals") on December 29, 2017. Compl. Ex. 5 at 10. BP argued that the FAST Act should not be applied retroactively and that ONRR incorrectly applied the six-year adjustment period instead of the seven-year limitation period. Compl. Ex. 5 at 6. BP reiterated its argument that despite ONRR's finding that the audit ended in July 2013, the audit actually extended into 2014, which would also make the refund requests timely for all periods sought. Compl. Ex. 5 at 8. Finally, BP contended that ONRR was statutorily time-barred from seeking repayment of improper refunds relating to the Mad Dog and Mica properties. Compl. Ex. 5 at 6.

Ultimately, the Interior Board of Land Appeals dismissed the appeal for lack of jurisdiction on June 21, 2018. Compl. Ex. 6 (dismissal decision).[8] The Royalty Management Act provides that if the Secretary of the Interior (the "Secretary") does not issue a final decision within 33 months from the date the proceeding commences, the Secretary is presumed to have issued a decision affirming the agency's prior decision. 30 U.S.C. § 1724(h).[9] The 33-month

---

[7]Although not explicitly stated in the complaint or the ONRR Director's decision, the court calculates the amount of $6,736,368 by subtracting the June 2014 refund amount from the total requested and then subtracting the amount the Director refused to refund, $1,282,447, for a total additional refund of $6,736,368.

[8] A decision by the Board of Land Appeals constitutes final agency action. *See* 43 C.F.R. § 4.21(d).

[9]Subsection 1724(h) provides as follows:

period ended in early 2018.  Compl. Ex. 5 at 9, Ex. 6.  Upon expiration, the lessee may seek judicial review within 180 days of receipt of notice of final agency action.  30 U.S.C. § 1724(h)(2), (j).  BP sought judicial review in this court on July 6, 2018.  Compl. at 1.

## STANDARDS FOR DECISION

### A.  Rule 12(b)(1) - Lack of Subject-Matter Jurisdiction

The Tucker Act provides this court with jurisdiction over "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."  28 U.S.C. § 1491(a)(1).  The

---

(h) Appeals and final agency action

  (1)  33-month period
Demands or orders issued by the Secretary or a delegated State are subject to administrative appeal in accordance with the regulations of the Secretary . . . .  The Secretary shall issue a final decision in any administrative proceeding, including any administrative proceedings pending on August 13, 1996, within 33 months from the date such proceeding was commenced or 33 months from August 13, 1996, which is later.  The 33-month period may be extended by any period of time agreed upon in writing by the Secretary and the appellant.

  (2)  Effect of failure to issue decision

If no such decision has been issued by the Secretary within the 33-month period referred to in paragraph (1)—

(A) the Secretary shall be deemed to have issued and granted a decision in favor of the appellant as to any nonmonetary obligation and any monetary obligation the principal amount of which is less than $10,000; and

(B) *the Secretary shall be deemed to have issued a final decision in favor of the Secretary*, which decision shall be deemed to affirm those issues for which the agency rendered a decision prior to the end of such period, as to any monetary obligation the principal amount of which is $10,000 or more, *and the appellant shall have a right to judicial review of such deemed final decision in accordance with Title 5.*

30 U.S.C. § 1724(h) (emphasis added).

BP and the government disagreed about when the 33–month period expired, but both agreed that its expiration precluded the Board of Land Appeals from rendering a decision.  *See* Compl. Ex. 6 at 2.

7

Tucker Act does not, however, provide a plaintiff with any substantive rights. *United States v. Testan*, 424 U.S. 392, 398 (1976). To establish this court's jurisdiction under the Tucker Act, "a plaintiff must identify a separate source of substantive law that creates the right to money damages." *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (*en banc* in relevant part) (citing *United States v. Mitchell*, 463 U.S. 206, 216 (1983); *Testan*, 424 U.S. at 398). If a plaintiff fails to raise a claim under a money-mandating provision, this court "lacks jurisdiction, and the dismissal should be for lack of subject matter jurisdiction." *Jan's Helicopter Serv., Inc. v. Federal Aviation Admin.*, 525 F.3d 1299, 1308 (Fed. Cir. 2008) (quoting *Greenlee Cty. v. United States*, 487 F.3d 871, 876 (Fed. Cir. 2007)).

A claim in this court is "barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501. This six-year statute of limitations is jurisdictional and is not susceptible to equitable tolling or any of the other doctrines that would excuse an untimely claim. *See John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 134-38 (2008).

BP, as plaintiff, must establish jurisdiction by a preponderance of the evidence. *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011) (citing *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988)). When ruling on the government's motion to dismiss for lack of jurisdiction, the court must "accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff." *Id*. at 1163 (citing *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995)). "If a court lacks jurisdiction to decide the merits of a case, dismissal is required as a matter of law." *Gray v. United States*, 69 Fed. Cl. 95, 98 (2005) (citing *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868); *Thoen v. United States*, 765 F.2d 1110, 1116 (Fed. Cir. 1985)); *see also* RCFC 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

### B.   *Rule 12(b)(6) - Failure to State a Claim Upon Which Relief Can be Granted*

A complaint will survive a motion to dismiss under RCFC 12(b)(6) if it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. The factual matters alleged "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555-56 (citations omitted).

When reviewing the complaint, "the court must accept as true the complaint's undisputed factual allegations and should construe them in a light most favorable to the plaintiff." *Cambridge v. United States*, 558 F.3d 1331, 1335 (Fed. Cir. 2009) (citing *Papasan v. Allain*, 478 U.S. 265, 283 (1986) (additional citation omitted)). Conclusory statements of law and fact, however, "are not entitled to the assumption of truth" and "must be supported by factual allegations." *Iqbal*, 556 U.S. at 679. "'[N]aked assertions[s]' devoid of 'further factual enhancement'" are insufficient to state a claim. *Id*. at 678 (quoting *Twombly*, 550 U.S. at 557); *Accord Bradley v. Chiron Corp.*, 136 F.3d 1317, 1322 (Fed. Cir. 1998) ("Conclusory allegations of law and unwarranted inferences of fact do not suffice to support a claim.").

## ANALYSIS

### A.  *Jurisdiction Over BP's Claims Under the Tucker Act*

The government argues that the Royalty Management Act contains a detailed remedial scheme that displaces the Tucker Act.  Def.'s Mot. at 10-14.  In consequence, the government avers that 30 U.S.C. § 1724(h) requires that judicial review be pursued only in federal district court.  *Id.* at 11.  As quoted earlier, Paragraph (2) of Subsection 1724(h) provides in pertinent part that "the appellant shall have *a right to judicial review* of such deemed final decision *in accordance with Title 5*."  30 U.S.C. § 1724(h)(2) (emphasis added).  While judicial review pursuant to Subsection 1724(h) does not specify where a lessee must file its complaint, the government interprets "in accordance with Title 5" as invoking not only the standard of review of the Administrative Procedure Act (the "APA"), but also implicitly routing relief to district courts, as this court lacks authority to invoke the APA as a source of jurisdiction.  Def.'s Mot. at 13.

This argument ignores that the APA *is not* itself an independent grant of jurisdiction to *any* court, whether to district courts or this court.  *See Califano v. Sanders*, 430 U.S. 99, 107 (1977); *Shinyei Corp. of Am. v. United States*, 355 F.3d 1297, 1304 (Fed. Cir. 2004) ("It is well established that the APA does not afford an implied grant of subject-matter jurisdiction permitting federal judicial review of agency action.") (quoting *Califano*, 430 U.S. at 107).  The APA also notably waives sovereign immunity only for claims "seeking relief *other than money damages*." 5 U.S.C. § 702.  That adjudication under the APA, as contrasted to merely invoking and using its standard or review, expressly excludes monetary relief gives the government no pause.  As it would have it, if relief is warranted, the district court can issue a declaratory judgment reversing the agency and a remand to the agency for relief in accordance with the court's equitable decision.  Hr'g Tr. at 18:11 to 19:21; *see* Def.'s Reply at 12.  In this respect, the government ignores *Delano Farms Co. v. California Table Grapes Commission*, 655 F.3d 1337, 1347 (Fed. Cir. 2011), in which the court commented that the APA "cannot serve as a 'backdoor' to . . . district court jurisdiction over a monetary claim."  Even so, the government bases its displacement argument on the statutory language used to invoke judicial review, the express waiver of several specified statutes of limitations, and the legislative history of the Royalty Simplification Act.[10]

---

[10]For purposes of its motion only, the government assumes that the former provisions of Section 1721 regarding interest on refunds of overpayments were money-mandating prior to its repeal by the FAST Act.  Def.'s Mot. at 10 n. 3.  The government also asserts without explanation that Sections 1721a and 1724 are not money-mandating.  *Id.* at 10.  Because the Tucker Act predicates this court's jurisdiction on the plaintiff's invoking a money-mandating statute, *e.g.*, *Jan's Helicopter Serv.*, 525 F.3d at 1308 (quoting *Greenlee Cty.*, 487 F.3d at 876), the court must address the money-mandating character of these statutes as part of its jurisdictional inquiry, *see, e.g.*, *Fisher*, 402 F.3d at 1173.

Prior to the FAST Act, Subsection 1721(j) stated in part: "If the estimated payment exceeds the actual royalties due, interest is owed on the overpayment."  30 U.S.C. § 1721(j) (2014); *see also id.* § 1721(h) ("Interest shall be allowed and paid or credited on any

BP counters that Subsection 1724(h) is silent as to which court has jurisdiction and contains no waiver of sovereign immunity. Pl.'s Opp'n at 2. It avers that the remedial scheme of 30 U.S.C. § 1724(h) does not displace the Tucker Act. *Id.* at 16. Rather, whether this court or a district court has jurisdiction would depend on the relief sought. "The Tucker Act waives sovereign immunity with regard to actions for money damages . . . and the APA waives sovereign immunity for actions 'seeking relief other than monetary damages.'" *Id.* at 22 (citing 28 U.S.C. § 1491 and quoting 5 U.S.C. § 702). BP contends that the Royalty Management Act, along with the Outer Continental Shelf Lands Act, Pub. L. No. 95-372, 43 U.S.C. §§ 1331-56b, provide the money-mandating statutes required to invoke the Tucker Act. Pl.'s Opp'n at 5. Thus in short, BP argues that the text of the Royalty Management Act and the APA, the legislative intent of the Royalty Simplification Act, and precedent in the circuit courts of appeals which had previously ruled on jurisdiction all point to this court as the proper forum for addressing BP's refund and interest claim.

"The Tucker Act is displaced . . . when a law assertedly imposing monetary liability on the United States contains its own judicial remedies. In that event, the specific remedial scheme establishes the exclusive framework for the liability Congress created under the statute." *United States v. Bormes*, 568 U.S. 6, 12 (2012) (citing *Hinck v. United States*, 550 U.S. 501, 506 (2007)). "A remedy furnished by statute preempts a more general remedy." *E.g.*, *Shearin v. United States*, 992 F.2d 1195, 1196 (Fed. Cir. 1993) (collecting cases). By a "detailed remedial scheme," the Supreme Court referred to one which "'set out a carefully circumscribed, time-limited, plaintiff-specific' cause of action [and] 'precisely define[d] the appropriate forum.'" *Bormes*, 568 U.S. at 15 (quoting *Hinck*, 550 U.S. at 507). In short, displacement occurs when another statute "enables claimants to pursue in court the monetary relief contemplated by the statute" "[w]ithout resort to the Tucker Act." *Id.* at 15. "But where two statutes are 'capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.'" *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1017 (1984) (quoting *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 133-34 (1974)) (subsequent citations omitted) (discussing Tucker Act displacement specifically).

"To determine whether a statutory scheme displaces Tucker Act jurisdiction, a court must 'examin[e] the purpose of the [statute], the entirety of its text, and the structure of review that it establishes.'" *Horne v. Department of Agriculture*, 569 U.S. 513, 527 (2013) (quoting *United*

_____

overpayment."). Section 1721a provides the process for a lessee to request a refund due to "overpayment of an obligation," *id.* § 1721a(a)(1), and Section 1724 describes the rights and process to enforce a royalty obligation, to include enforcing a "demand" arising from or relating to a lessee's royalty obligation, *id.* § 1724(b), (c), (i), (j). "'Obligation' means . . . any duty of the Secretary . . . to pay, refund, offset, or credit monies including . . . principal . . . [or] interest." *Id.* § 1702(25)(A). A "refund" is "the return of an overpayment," *id.* § 1702(30) and an "overpayment" is "any payment by a lessee . . . in excess of an amount legally required to be paid . . . and includes the portion of any estimated payment . . . in excess of the royalties due," *id.* § 1702(27). A "demand" includes "a separate written request by a lessee . . . which asserts an obligation due the lessee." *Id.* § 1702(23)(B). The non-discretionary nature of the statutory text requiring refunds with interest to the lessee when properly requested therefore indicates that these provisions are money-mandating. The Act also mandates payment of refunds by the Secretary of the Treasury. *Id.* § 1721a(b)(2).

*States v. Fausto*, 484 U.S. 439, 444 (1988) (alteration in original)).  "[T]he proper inquiry [for displacement] is not whether the statute 'expresses an affirmative showing of congressional intent to permit recourse to a Tucker Act remedy,' but 'whether Congress has in the [statute] withdrawn the Tucker Act grant of jurisdiction to the Court of Claims . . . .'" *Ruckelshaus*, 467 U.S. at 1017 (quoting *Regional Rail Reorganization Act Cases*, 419 U.S. at 126) (alteration in original).

Displacement requires an unambiguous intent, even where a comprehensive remedial scheme is present.  *E.g.*, *Ruckelshaus*, 467 U.S. at 1017; *see also Acceptance Ins. Co. Inc. v. United States*, 503 F.3d 1328, 1336 (Fed. Cir. 2007) ("[W]ithdrawal of Tucker Act jurisdiction by implication is disfavored, which means that a court must find that the statute at issue . . . reflects an unambiguous congressional [] intent to displace.").  Consequently, the Supreme Court has ruled that "a comprehensive regulatory statute" does not inherently displace the Tucker Act. *Ruckelshaus*, 467 U.S. at 991, 1017.  In *Ruckelshaus*, the Supreme Court found that the Federal Insecticide, Fungicide, and Rodenticide Act was a "comprehensive regulatory statute" that created a "mandatory data-licensing scheme" between private parties and the Environmental Protection Agency, with an administrative process followed by judicial review to resolve disputes involving compensation.  *Id.* at 991-97, 1017.  A district court had held that several data disclosure provisions constituted a Fifth Amendment Taking but that the remedies afforded by the statute were inadequate and the Tucker Act was displaced by the comprehensive scheme, and thus enjoined enforcement of those provisions.  *Id.* at 999-1000.  The Supreme Court, in vacating the district court's decision, held that while a Fifth Amendment Taking did occur, a remedy under the Tucker Act remained because Congress had not clearly withdrawn its jurisdiction and the district court could have construed the statues as complimentary.  *Id.* at 1016-17.

1. *Statutory scheme for refund requests under the Royalty Management Act.*

The Royalty Simplification Act's amendments to the Royalty Management Act established an administrative process for both the government and a lessee to correct royalty payments, subject to judicial review.  *See* Royalty Simplification Act §§ 4, 5 (codified at 30 U.S.C. §§ 1721a, 1724).  A lessee must resort to the administrative process before seeking judicial review.  *See* 30 U.S.C. § 1724(h); *see also* 43 C.F.R. § 4.21(c) (providing that a Department of Interior Director's decision that remains administratively appealable is not final agency action).

A lessee may seek a refund of an overpayment within "a reasonable period of time" and within the "adjustment period."  *Id.* § 1721a(a)(1).  The adjustment period is a "six-year period following the date on which an obligation became due," but the period may be tolled for enumerated reasons, such as mutual agreement of the lessee and the government.  *Id.* § 1721a(a)(4); *see also id.* § 1724(d).  An obligation becomes due "when the right to enforce the obligation is fixed," which occurs on the last day of the month following the month of production.  *Id.* § 1724(c).  Outside of the adjustment period, a refund may only be requested during an audit of the royalty paid or due.  *Id.* § 1721a(a)(3).

A lessee seeks a refund by making a written request to the Secretary that is identified as a "demand" and describes when and why the overpayment occurred and to whom it is owed.  30 U.S.C. § 1721a(b).  The Secretary must pay or deny the refund within 120 days of receipt.  *Id.* §

1721a(b)(3).  A lessee's refund demand is made to ONRR.  ONRR's decision to pay or deny the refund constitutes an order, *see* 30 C.F.R. § 1290.102 (defining "order" to include a "decision to deny a lessee's . . . written request that asserts an obligation due the lessee"), and is appealable within a prescribed time to the ONRR Director, *id.* § 1290.105(a).  The decision of the ONRR Director is appealable within a prescribed time to the Interior Board of Land Appeals.  *Id.* § 1290.108; *see also* 43 C.F.R. § 4.1(b)(2) & subpt. E.  A decision by the Board of Land Appeals constitutes final agency action.  43 C.F.R. § 4.21(d).

The Secretary must, however, "issue a final decision in any administrative proceeding . . . within 33 months from the date such proceeding was commenced," though the parties may agree to extend the period.  30 U.S.C. § 1724(h)(1).  An administrative proceeding encompasses "any Department of the Interior agency process in which a demand, decision or order issued by the Secretary . . . is subject to appeal or has been appealed."  *Id.* § 1702(18).  A demand includes a "written request by a lessee . . . which asserts an obligation due the lessee . . . that provides a reasonable basis to conclude that the obligation in the amount of the demand is due and owing."  *Id.* § 1702(23)(B).

If there is no final decision after 33 months, "the Secretary shall be deemed to have issued a final decision . . . affirm[ing] those issues for which the agency rendered a decision prior to the end of [the 33-month] period" as to any monetary obligation exceeding $10,000.  30 U.S.C. § 1724(h)(2)(A)-(B).  A lessee without a final decision after the time has expired has a "right to judicial review of such deemed final decision in accordance with Title 5."  *Id.* § 1724(h)(2)(B).  No judicial forum for review is specified.  The lessee may seek review beyond the seven-year limitation period "so long as such judicial proceeding is commenced within 180 days from receipt of notice by the lessee . . . of the final agency action."  *Id.* § 1724(j).

2.  *Whether unambiguous intent to displace the Tucker Act exists.*

The Royalty Management Act, as amended, does provide a remedial scheme for requesting refunds by establishing requirements for a lessee to pursue refund demands with ONRR and requiring a final agency decision within 33 months.  *See* 30 U.S.C. §§ 1721a(4), 1724(b), (h).  It contains time limits for requesting refunds, commencing demands, or initiating judicial proceedings, and specifies when claims accrue and methods to terminate or toll the time limits.  *Id.* §§ 1721a, 1724(b)-(d), (e), (j).  It identifies plaintiffs in refund demands as lessees or their designees.  *Id.* § 1721a.  The cause of action available to a lessee when the Secretary fails to act is, as stated previously, "judicial review [of the agency's last decision] . . . in accordance with Title 5."  *Id.* § 1724(h)(2)(B).

As noted earlier, the existence of a remedial scheme does not inherently displace the Tucker Act.  Rather, the existence of a remedial scheme requires that the terms of that scheme govern the process for relief and the relief afforded.  *See Bormes*, 568 U.S. 12-14; *see also Ruckelshaus*, 467 U.S. at 992-97.[11]  Here, the Royalty Management Act contains no express

---

[11]BP argues that the Royalty Management Act does not waive sovereign immunity, *see* Pl.'s Opp'n at 29, but the court disagrees.  It allows a lessee to request a monetary refund and, if denied, to seek judicial review, which could result in a grant of the refund.  30 U.S.C. § 1724(h).  The Act also mandates payment of refunds by the Secretary of the Treasury.  *Id.* § 1721a(b)(2).

requirement of where judicial review must be sought.  Therefore, for the Royalty Management Act's remedial scheme to displace this court's jurisdiction under the Tucker Act, the Royalty Management Act's invocation of the APA must necessarily imply judicial review before a court other than this court.  The court finds it does not and that no displacement of this court's jurisdiction occurs.  Rather, existing jurisdictional principles determine the proper forum.  *See Ruckelshaus*, 467 U.S. at 1016-17; *Straughter v. United States*, 120 Fed. Cl. 119, 125 (2015).  As a result, claims by a lessee against the government for money damages come to this court, and claims against a lessee or by a lessee seeking relief other than money damages head to a district court.

Merely invoking the APA when permitting judicial review does not deprive this court of jurisdiction.  The APA waives sovereign immunity with respect to equitable relief sought against the United States and provides a standard for reviewing administrative decisions.  *See* 5 U.S.C. § 702.  It does not channel relief to any specific court.  *See id.* (referring to "a court of the United States").  This court's Tucker Act jurisdiction encompasses monetary claims against the government not sounding in tort and disputes regarding government contract solicitations and award decisions.  28 U.S.C. § 1491.  A claim challenging an agency action can therefore properly arise under the Tucker Act, and when it does, this court invokes the standards of review under the APA when reviewing the agency's action.[12]

Review under the APA is pertinent for a number of types of claims before this court, and the court has a specific rule in place to facilitate review in such cases.  *See, e.g.*, RCFC 52.1(a) ("When proceedings before an agency are relevant to a decision in a case, the administrative record of those proceedings must be certified by the agency and filed with the court.").

For example, the Tucker Act expressly invokes the APA regarding this court's review of agency procurement decisions involving contract solicitations, bid evaluations, and contract awards.  28 U.S.C. § 1491(b)(1), (4).  It requires this court to review the agency's decisions "pursuant to the standards set forth in section 706 of Title 5," *i.e.*, the standard of review prescribed in the APA.  *Id.* § 1491(b)(4).  And, for military service members seeking monetary payments or disability benefits in this court under the Tucker Act, it is "well established that judicial review of military correction boards is conducted under the APA."  *Walls v. United States*, 582 F.3d 1358, 1367 (Fed. Cir. 2009) (citations omitted); *see also Metz v. United States*, 466 F.3d 991, 998 (Fed. Cir. 2006) ("[T]he Court of Federal Claims reviews [a military board] action under the same standard as any other agency action, [which is] whether the decision is arbitrary, capricious, unsupported by substantial evidence, or contrary to law.") (citing *Porter v. United States*, 163 F.3d 1304, 1312 (Fed. Cir. 1998)).  Contrastingly, if correction of a military board's decision would not mandate compensation, this court would lack jurisdiction.  *See, e.g.*, *Murphy*, 93 F.2d at 874.  The court accordingly invokes the rubric of the APA to review an agency action when the claim arises under a grant of jurisdiction to this court independent of the

---

[12]A suit seeking "relief other than money damages" under the APA would not be reviewable by this court, except for government procurement decisions, because the agency's action would not be money-mandating within this court's Tucker Act jurisdiction.  *See Heuss v. United States*, 315 Fed. Appx. 255, 257 (Fed. Cir. 2008) ("[T]he Court of Federal Claims does not have jurisdiction to hear cases *arising* under the APA.") (citing *Murphy v. United States*, 993 F.2d 871, 874 (Fed. Cir. 1993) (emphasis added).

APA.  *See Martinez v. United States*, 333 F.3d 1295, 1313-14 (Fed. Cir. 2003) ("To be sure, in monetary actions brought under the Tucker Act, the . . . Court of Federal Claims [has] often reviewed [military personnel decisions] . . . . [It has] treated a claim for back pay within [its] jurisdiction as an appropriate occasion for review the actions of the [military].  And in doing so, [it has] granted relief [if it has] found that the [military's] decision is arbitrary, capricious, unsupported by substantial evidence, or contrary to law.") (citations and internal quotations omitted).

BP presents claims arising under the Tucker Act, as BP seeks monetary damages against the United States arising from a money-mandating statute, mainly the Royalty Management Act. *See generally* Compl.  That the court must proceed by reviewing the agency's decisions under the APA standard rather than conducting a *de novo* determination of the facts presents no impediment to this court's jurisdiction.  Put simply, the court is not exercising jurisdiction over claims arising under the APA.  Rather, the court is exercising jurisdiction under the Tucker Act, and will review the underlying agency decision pursuant to the standards of the APA and RCFC 52.1, just as it would for a government procurement case or a military pay or disability case.

The government asks the court to distinguish between the language used to invoke the APA by the Tucker Act regarding procurement protests and by the Royalty Management Act.  Def.'s Mot. at 13-14.  While the Tucker Act states that this court reviews an agency's procurement decision "*pursuant to the standards* set forth *in section 706* of Title 5," 28 U.S.C. § 1491(b)(4) (emphasis added), the Royalty Management Act grants a "right to judicial review . . . *in accordance with* Title 5," 30 U.S.C. § 1724(h)(2)(B) (emphasis added).  The government contends there is an "unambiguous" difference in this express language, specifically that "pursuant to the standards" merely imports the standard, but "in accordance with title 5" also imports the forum implicit in the equitable relief permitted by APA review.  Def.'s Mot. at 13-14.  Yet, directing judicial review "in accordance with Title 5" neither explicitly nor implicitly connotes exclusive jurisdiction in the district courts.  As the government's own motion noted, "the prepositional phrase 'pursuant to' carries the meaning of '. . . in accordance with.'" Def.'s Mot. at 13 (quoting *Baird v. Sonnek*, 944 F.2d 890, 893 (Fed. Cir. 1991)).  Thus, the introductory phrases of both statutes are on a par with each other.  More tellingly, other remedial schemes that displace the Tucker Act specify a particular forum of review, including those that invoke the APA.

For example, the Federal Crop Insurance Reform and Department of Agriculture Reorganization Act of 1994 ("Agriculture Reorganization Act"), Pub. L. No. 103-354 (amending, among other provisions, 7 U.S.C. §§ 6991-7002), creates one remedial scheme invoking the APA, *see St. Bernard Parish Gov't v. United States*, 916 F.3d 987, 991 (Fed. Cir. 2019).  When St. Bernard Parish brought suit against the Department of Agriculture in this court under the Tucker Act invoking a contract theory, the Court of Appeals for the Federal Circuit affirmed the trial court's dismissal of the action, finding that Congress had "provided for such claims to be addressed [administratively], followed by judicial review in a federal district court." *Id*. at 991.  The Agriculture Reorganization Act stated that a "final determination of the [Department of Agriculture's National Appeals] Division shall be reviewable and enforceable by any United States *district court* of competent jurisdiction *in accordance with* chapter 7 of Title 5." 7 U.S.C. § 6999 (emphasis added); *St. Bernard Parish Gov't*, 916 F.3d at 997.  Similarly, the Medicare Act displaces the Tucker Act because it *specifies* "district court" review "pursuant to

the applicable provisions under chapter 7 of Title 5." 42 U.S.C. § 1395oo(f)(1); *accord St. Vincent's Med. Ctr. v. United States*, 32 F.3d 548, 550 (Fed. Cir. 1994) (citing 42 U.S.C. § 1395oo(f)(1)).

Statutes found to displace the Tucker Act absent reference to the APA also identify the forum with particularity. The Fair Credit Reporting Act specifies that "jurisdiction will lie 'in any appropriate United States district court, . . . or any other court of competent jurisdiction,'" and thus a claimant could "pursue in court the monetary relief contemplated by the statute" "[w]ithout resort to the Tucker Act." *Bormes*, 568 U.S. at 15 (quoting 15 U.S.C. § 1681p); *see also Horne*, 569 U.S. at 527-28 (relying on the specification of district court review in the Agricultural Marketing Agreement Act); *Alpine PCS, Inc. v. United States*, 878 F.3d 1086, 1093-94 (Fed. Cir. 2018) (relying on the specification in the Communications Act of the D.C. Circuit as the forum to review orders by the Federal Communication Commission); *Shearin*, 992 F.2d at 1196 (A request for an award of attorney fees under the Criminal Justice Act "shall be made to the district court [or the] appellate court before which the attorney provided representation.") (quoting 18 U.S.C. § 3006A(d)(4)).[13]

In contrast, statues that do not specify a forum have been held to not displace the Tucker Act. *See Abbey v. United States*, 745 F.3d 1363, 1369-70 (Fed. Cir. 2014) (distinguishing the Fair Credit Reporting Act from the Fair Labor Standards Act by finding that the latter act did not displace the Tucker Act because designating "'any Federal or State court of competent jurisdiction' . . . does not specify a forum that is contrary to that specified by the Tucker Act.").

To sum, statutes found to displace the Tucker Act are unambiguous as to where jurisdiction lies. What distinguishes the remedial scheme in the Royalty Management Act from those statutes that displace the jurisdictional grant of the Tucker Act are statutorily-specified forums of review. Such specification "afford[s] . . . a ready avenue to bring . . . claims," *Horne*,

---

[13]The government cites to *Colorado Dep't of Human Servs. v. United States*, 74 Fed. Cl. 339 (2006), where this court held that "appeal and review . . . *for purposes of* chapter 7 of . . . Title 5" under the Randolph-Sheppard Act precluded this court's jurisdiction, *id.* at 347 n.7 (citing 20 U.S.C. § 107d-2) (emphasis added). The Randolph-Sheppard Act gives "blind vendors a priority to operate vending facilities on federal property," *id.* at 341, and contains a "comprehensive scheme for the resolution of disputes," *id.*, where an arbitration panel must first issue a decision, which is then subject to "'appeal and review . . . *for purposes of* chapter 7 of . . . Title 5,'" *id.* at 345 (quoting 20 U.S.C. § 107d-2) (emphasis added). The claim arose as a protest to the Air Force's decision to let a dining facility contract with the plaintiff expire and thus allow the Air Force to perform the services in-house. *Id.* at 341-42. Plaintiffs sought a preliminary injunction in this court pending the decision of the arbitration panel. *Id.* at 340. The court held it lacked jurisdiction to issue an injunction because it lacked jurisdiction to review an arbitration panel's decision, either under the APA (because the APA is not a jurisdictional statute) or under the Tucker Act. *Id.* at 347-48. While the court found the Tucker Act displaced by the Randolph-Sheppard Act's remedial scheme, it was not evident that Tucker Act jurisdiction would have existed regardless, and the court even "question[ed] whether a 'procurement' exists in this case." *Id.* at 348. At bottom, even though no forum was specified by the statute, it appears that no claim in that case was or could have been brought within Tucker Act jurisdiction.

569 U.S. at 527, and "precisely define[s] the appropriate forum," *Hinck*, 550 U.S. at 506-07. The Royalty Management Act does neither.

Furthermore, the general reference to APA review in Subparagraph 1724(h)(2)(B) stands in contrast to other portions of the Royalty Management Act in which district courts are expressly designated as the appropriate forum for certain types of actions. Prior to 1996, district courts were empowered to compel compliance with a subpoena issued by the Department, 30 U.S.C. § 1717(b), to review on the administrative record civil penalties issued by the Department, *id*. § 1719(j), to hear civil actions for injunctive and specific enforcement brought by the Attorney General, *id*. § 1722, and to hear suits brought by a state against a lessee, *id*. § 1734(b). After amendment by the Royalty Simplification Act in 1996, district courts were further enabled to review Department orders regarding state delegation proposals. *Id*. § 1735(g). Each such grant of jurisdiction to the district courts specifies which district court has jurisdiction. *E.g.*, *id*. § 1719(j) (where the alleged violation took place); *id*. § 1722(b) (where the violation allegedly occurred or where the defendant is found or transacts business); *id*. § 1735(g) (district that includes the capital of the affected state). That Congress specifically identified district courts as the judicial forum for five types of claims, but did not do so for Subparagraph 1724(h)(2)(B), indicates that district courts were not intended to be the exclusive forum for judicial review under Subparagraph 1724(h)(2)(B). *See Keene Corp. v. United States*, 508 U.S. 200, 208 (1993) ("Where Congress includes particular language in one section but omits it in another," it is "presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."). In short, nothing in the statutory context demonstrates the unambiguous intent necessary to displace the Tucker Act for actions for monetary relief under Subparagraph 1724(h)(2)(B).

The government nonetheless contends that Congress adopted Subparagraph 1724(h)(2)(B) with an awareness that most review litigation had occurred in district courts, with a few cases in this court. Def.'s Mot. at 14. Given this background, the government argues that Congress intended to confirm that judicial review would occur before district courts, "by tying judicial review to 'Title 5.'" As an example, the government points to the Senate Committee Report to S. 1014,[14] which mentions that under current practice, after the Secretary takes jurisdiction of a matter, "an appellant [could] pursue relief in U.S. District Court." Def.'s Mot. at 14 (citing S. Rep. No. 104-260, at 14 (1996)) (alteration in original).

As previously discussed, merely tying judicial review to the APA does not inherently channel cases exclusively to the district courts. Rather, reference to the APA serves to delineate the type of adjudication that would occur, not the forum that would conduct the review. Had 30 U.S.C. § 1724(h) merely provided for judicial consideration, *de novo* determination of the facts might be permissible. The APA, however, dictates a review of factual matters based on the administrative record as it existed at the time of the decision. *See* 5 U.S.C. § 706.

The legislative history of the Royalty Simplification Act supports this inference regarding the standard of review over that offered by the government. As initially proposed by H.R. 1975, the Royalty Simplification Act provided a "lessee [with] a right of *de novo judicial review* and

---

[14]S. 1014 was the Senate's companion bill to H.R. 1975, the House's Royalty Simplification Act.

appeal of such final agency action."  H.R. 1975, 104th Cong., § 3 at 8 (1995) (enacted, as amended) (emphasis added); *accord* 141 Cong. Rec. 18,060 (1995) (S. 1014, companion bill to H.R. 1975).  During a hearing on H.R. 1975 held by the House Subcommittee on Energy and Mineral Resources on July 18, 1995, an organization of royalty auditors for states and tribal authorities submitted written testimony objecting to *de novo* review.  *A Bill to Improve the Management of Royalties From Federal & Outer Continental Shelf Oil & Gas Leases, and for Other Purposes: Hearing on H.R. 1975 Before the H. Subcomm. on Energy & Mineral Res. of the H. Comm. on Res.*, 104th Cong. 140-41 (1995) [hereinafter *Hearing on H.R. 1975*] (statement of Wanda Fleming, First Vice Chair, State & Tribal Royalty Audit Comm.).  When H.R. 1975 was reported from the committees and subsequently passed by both houses, judicial review was changed to be "in accordance with Title 5."  142 Cong. Rec. 17,291 (1996) (H.R. 1975, Royalty Simplification Act, as passed by the House of Representatives); *accord* S. Rep. No. 104-260, at 8, 39 (1996) (Report on S. 1014, amending the judicial review provision among others); *see also* 142 Cong. Rec. 21,662 (1996) (Senate's passage of H.R. 1975 as amended, noting it was identical to S. 1014 as reported); H.R. Rep. No. 104-667, at 8, 38 (1996) (Report on H.R. 1975, amending the judicial review provision, among others).

The Senate Report's brief reference to existing practice of judicial review in district court occurs in the context of explaining why the "lengthy administrative appeals process," which was causing "$450 million in disputed claims [to] languish in a bureaucratic appeals process," necessitated cutting off the administrative process after 33 months.  S. Rep. 104-260, at *14.  The court sees no intent that this remark served to indicate Congress's intention to specify a particular forum.  If that had been Congress' goal, it would have had to express a desire to eliminate this court as a forum, dislodging established practice.

Prior to enactment, this court had exercised jurisdiction over royalty claims in which lessee sought monetary relief by way of a refund, while district courts did not.  *See Diamond Shamrock Expl. Co. v. Hodel*, 853 F.2d 1159, 1168 (5th Cir. 1988) (finding that a referred request "against the United States seeking monetary relief in excess of $10,000.00" and brought "under the authority of 30 U.S.C. § 1711(c)(1)" is "within the exclusive jurisdiction of the Claims Court under the Tucker Act") (citing *Amoco Production v. Hodel*, 815 F.2d 352 (5th Cir. 1987); *Marathon Oil Co. v. United States*, 16 Cl. Ct. 332 (1989) ("[T]his court has subject matter jurisdiction to the extent Marathon seeks a refund of the approximately $1,700,000 paid [pursuant to the Royalty Management Act]."); *cf. Chevron U.S.A., Inc. v. United States*, 923 F.2d 830 (Fed. Cir. 1991) (holding that the "Claims Court appropriately took jurisdiction of the [royalty] refund claim based on the [Outer Continental Shelf Lands Act."]).[15]  And when the

_____

[15]While not binding on this court, the court notes cases in three circuits that address jurisdiction over refund requests subsequent to enactment of the Royalty Simplification Act.  The Fifth and Tenth Circuit Courts of Appeals have maintained that suits for refunds of royalty overpayments arise under the Tucker Act and must be brought in this court.  In *Santa Fe Snyder Corporation v. Norton*, 385 F.3d 884, 893 (5th Cir. 2004) and *Amerada Hess Corp. v. Department of Interior*, 170 F.3d 1032, 1035-36 (10th Cir. 1999), both courts dismissed claims for refunds of royalty overpayments for lack of subject-matter jurisdiction, and cited *Diamond Shamrock*, 853 F.2d at 1168, for the proposition that the Court of Federal Claims has exclusive jurisdiction over refund claims.  Plaintiffs in both cases, however, requested refunds under other

legislative history does refer to prior judicial decisions, it does so in the context of the need to resolve circuit splits over the applicable statute of limitations. *See* H.R. Rep. 104-667, at 14, 48-49; *see also Hearing on H.R. 1975*, at 2, 20-21, 101-03.

The House Report of the Royalty Simplification Act describes the purpose as "establish[ing] clear and equitable provisions for the effective and efficient administration of leases . . . to further exploration and development of oil and gas resources." H.R. Rep. 104-667, at 13. The House Report identifies as the basis for the amendments a "lack[] in clarity, consistency and reciprocity, and [] inequities which impose unnecessary and unreasonable costs and burdens on lessees and the [f]ederal [g]overnment alike." *Id.* "For example, multiple conflicting statutes of limitation for suits to collect royalty payments and recent court decisions . . . have created uncertainty and unfairness for lessees and operators subject to indefinite audit collection. . . . In addition, current law severely restricts [] lessees' access to overpayments made to the [f]ederal [g]overnment, and does not provide for the time value of lessees' overpayments." *Id.* at 14. According to the Senate Report, the Royalty Simplification Act would, among other things, speed the audit, collection, and appeals process, lessen record retention requirements and burdens, grant reciprocity regarding interest for incorrect payments, and reduce the administrative burden on small operators. S. Rep. 104-260, at 13-14. The Senate Report also noted uncertainties regarding the statute of limitations applicable to government audits. *Id.* at 14. Overall, neither the text of the Act nor the legislative history in the House and Senate identify the purpose of the Royalty Simplification Act as channeling judicial review to any particular court. The expressed statutory purposes simply do not bear on the court's exercise of jurisdiction.[16]

---

offshore royalty statutes, not the Royalty Management Act. *See Santa Fe Snyder*, 385 F.3d at 885-86; *Amerada Hess*, 170 F.3d at 1033.

Tangentially, the Court of Appeals for the D.C. Circuit found that a district court had jurisdiction under Subsection 1724(h) where the issue was whether the 33-month period had elapsed. *See Murphy Expl. & Prod. Co. v. United States Dep't of the Interior*, 252 F.3d 473, 475 (D.C. Cir. 2001). The D.C. Circuit held that the 33-month deadline commenced when the plaintiff submitted its refund request, not when the administrative appeal commenced, and thus the agency's decision could be deemed final. *Id.* at 475, 477. The agency action appealed to the district court was not a refund denial, but rather the agency's 1998 order to plaintiff to pay the government $368,000 in royalties, which represented the balance after accounting for underpayments and overpayments. *Id.* at 476-77. The precise jurisdictional issue addressed was whether the agency's action should be deemed final. *Id.* at 480-82.

[16]As amended, the Royalty Simplification Act made changes to the remedial scheme as follows. Section 2 added 17 definitions, including terms such as "adjustment," "commence," "demand," "obligation," "overpayment," and "refund." Section 3 expanded activities that the Secretary of the Interior could delegate to the states and the process for delegation, and provided judicial review of the Secretary's decision before a district court in the affected state. Pub. L. No. 104-185, § 3, 110 Stat. at 1702-04 (codified at 30 U.S.C. § 1735). Section 4 added Section 1724 in its entirety, which, among other things, established the seven-year limitation period and tolling criteria, replaced several statutes of limitations, specified records that lessees must maintain, and established the appeals process and right of judicial review under the APA when

In sum, the Royalty Management Act does not displace this court's jurisdiction. Subsection 1724(h) does not specify a particular forum for judicial review of ONRR's rejection of BP's monetary claims. The reference to the APA in Subparagraph 1724(h)(2)(B) provides the *standard* of review, not the *forum* of review, a conclusion supported by the legislative history and consistent with the statutory purpose. To find displacement here, the court would have to adopt inferences lacking support from the statutory text or legislative history. But Tucker Act displacement requires an unambiguous intent. *E.g.*, *Ruckelshaus*, 467 U.S. at 1017; *Acceptance Ins.*, 503 F.3d at 1336-37. Absent express intent to displace the Tucker Act and without a need to do so to effectuate the statutory remedial scheme, the court has no basis to infer that invocation of the APA does anything more than establish the standard for judicial review. Accordingly, so long as the claims arise under the Tucker Act by invoking a money-mandating statute, a contract, or the Constitution, this court continues to have jurisdiction over a lessee's monetary refund claims following the amendments wrought by the Royalty Simplification Act.

### 3.  *Accrual of the claims and application of statute of limitations.*

The government argues that even if jurisdiction is proper under the Tucker Act, BP's claims are time-barred by the six-year statute of limitations applicable to claims before this court under 28 U.S.C. § 2501. Def.'s Mot. at 18. While the government raises this statute of limitation for only BP's contract claim (Count III), Def.'s Mot. at 18-20, BP's claims invoke only different theories for the same relief requested, and accordingly the court's analysis does not distinguish between the legal theories to analyze whether any of BP's claims are barred by the statute of limitations. Moreover, the relevance of the specific limitation periods in the Royalty Management Act, *see supra*, at 4-5 & nn. 3-4, bears on the court's analysis. Because BP filed its claim on July 6, 2018, the government contends that claims before July 6, 2012 are untimely. *Id.* at 20. BP's claims relate to overpayments made between January 2004 and December 2007. BP argues that because the Royalty Management Act specifies mandatory administrative remedies, its claims did not accrue until final agency action, which occurred in June 2018. Pl.'s Opp'n at 12-13.

A claim in this court is "barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501. The six-year statute of limitations is jurisdictional and is not susceptible to equitable tolling or any of the other doctrines that would excuse an

---

the agency fails to act within 33 months. *Id.* § 4, 110 Stat. at 1704-10 (codified at 30 U.S.C. § 1724). Section 5 added Section 1721a in its entirety, which established the process for lessees to make adjustments to incorrect payments and request refunds of overpayments. *Id.* § 5, 110 Stat. at 1710-12 (codified at 30 U.S.C. § 1721a). Section 6 added the subsequently repealed provisions governing payment to lessees of interest on overpayments, and revised methods for paying royalties and allocating production and royalty liability among lessees. *Id.* § 6, 110 Stat. at 1710-15 (codified at 30 U.S.C. § 1721). Section 7 allowed for prepayment and regulatory relief for lessees of marginally producing properties. *Id.* § 7, 110 Stat. at 1715-16 (codified at 30 U.S.C. § 1721). The remaining sections included a statement that two provisions, including the original statute of limitations, were no longer applicable given other amendments, exempted leases on Indian or private lands from these amendments, established an effective date, and explicitly stated that no property right or interest arose with a state against any Federal lease or land. *Id.* §§ 8-12, 110 Stat. at 1717 (codified at 30 U.S.C. §§ 1701, 1732).

untimely claim. *See John R. Sand & Gravel Co.*, 552 U.S. at 134. Yet, Congress can always carve out exceptions by statute, U.S. Const. Art. I § 8, Art. III § 2, and a "remedy furnished by statute preempts a more general remedy," *e.g.*, *Shearin*, 992 F.2d at 1196. And "if a dispute is subject to mandatory administrative proceedings, the plaintiff's claim does not accrue until the conclusion of those proceedings." *E.g.*, *Martinez*, 333 F.3d at 1304.

BP's refund claim was subject to the mandatory administrative proceedings of the Royalty Management Act. That process commences with a refund request made either within six years of the obligation becoming fixed or during an audit, can be appealed though administrative procedures, and can be followed by judicial review contingent upon either final agency action or 33 months elapsing since requesting the refund. *See* 30 U.S.C. §§ 1721a, 1724. Judicial review could be had within seven years of the obligation becoming fixed, although this seven-year period could be tolled or terminated early. *See id.* § 1724(b), (d), (e), (h). Further, judicial review of an obligation more than of seven years old is timely if sought within 180 days of notice of final agency action. *See id.* § 1724(j).

BP complied with the statutory requirements to seek judicial review within 180 days of notification of final agency action, having been notified on June 21, 2018 of the dismissal of its appeal due to the agency's inaction, and then having filed its complaint on July 6, 2018. Specific to BP's contract claim, the claim accrued not when either parties' royalty obligations became fixed, but when the alleged breach occured. To the extent a breach occurred, it would have occurred when ONRR denied BP its refund and interest, which given the mandatory administrative remedies, also occurred upon the final agency action. To the extent a taking of interest occurred, it too would have accrued upon the final agency action that refused interest that had accrued at the time of BP's requests.

### B. *Whether the Court Can Grant Relief*

Separate from its argument about statute of limitations, the government contends that BP fails to allege sufficient facts to show that the leases or tolling agreements contained terms that entitled BP to a refund of overpayments or interest. Def.'s Mot. at 21-22. The government accordingly seeks to dismiss Counts III and IV, but not Counts I and II, for failure to state a claim upon which relief can be granted. *See id.* at 25 (arguing that the court should dismiss the complaint for lack of jurisdiction, "or, in the alternative, dismiss Count III for failure to state a claim upon which relief may be granted.").

1. *Count III: contract theory for refund and interest claimed.*

Count III repackages the refund and interest claims of Counts I and II under a contract theory. *See* Compl. ¶¶ 45-47. It is undisputed that BP executed leases and tolling agreements with the government. BP alleges that pursuant to these contracts, it is entitled to pay no more than the royalty it actually owed. Compl. ¶¶ 1, 45-48. BP's underlying claim is plausible, given the facts and statutory obligations. Even so, the court cannot independently grant relief to BP under this theory in light of the remedial scheme, which delineates the type of relief BP may seek and the process by which it may claim that relief. *See* 30 U.S.C. §§ 1721, 1721a, 1724; *see also Bormes*, 568 U.S. at 13-14 ("We have long recognized that an additional remedy in the Court of Claims is foreclosed when it contradicts the limits of a precise remedial scheme. . . . Where a

specific statutory scheme provides the accoutrements of a judicial action, the metes and bounds of the liability Congress intended to create can only be divined from the text of the statute itself."); *see also Alpine PCS*, 878 F.3d at 1093-94.  The statutory relief covers the entirety of BP's claims.

BP defends the claim by invoking several cases in which new statutes that prevented the government from adhering to oil and gas lease terms gave rise to cognizable contract claims.  Pl.'s Opp'n at 11 & n.7 (citing, among others, *Mobil Oil Expl. & Prod. SE., Inc. v. United States*, 530 U.S. 604 (2000); *Amber Res. Co. v. United States*, 538 F.3d 1358 (Fed. Cir. 2008)).  Yet, these cases address jurisdiction and not whether an independent contract claim can survive a remedial scheme that specifies remedies.  Further, to the extent that a new statute precluded adherence to contract terms, that new statute here would be the FAST Act, and thus only apply to BP's claim for interest on overpayments.  The interest entitlement, however, was a statutory creation, and BP has not alleged sufficient facts to assert it was entitled to interest independent from the terms of 30 U.S.C. § 1721.  Because BP does not allege it was owed interest pursuant to contract terms, BP has not plausibly alleged the FAST Act breached its contract.  Count III consequently must be dismissed for failure to state a claim.

2.  *Count IV: Fifth Amendment taking of interest.*

Count IV presents BP's interest claim as a Fifth Amendment Takings claim.  Compl. ¶ 52-55.  The government contends that because BP "exclusively relies on a statutory entitlement," no property interest exists.  Def.'s Mot. at 23.  BP counters that it alleged a property right and that a dispute over a property interest is not fatal to the claim at the pleadings stage.  Pl.'s Opp'n at 14.  In effect, the government seeks to dismiss Count IV for lack of jurisdiction.

The court has jurisdiction over takings claims and BP alleges a property right in interest on its overpayment.  Whether BP has a property right in the interest presents questions of law and fact, but not ones of this court's jurisdiction.  *See Jan's Helicopter Serv.*, 525 F.3d at 1309 ("In determining whether the Court of Federal Claims has jurisdiction, all that is required is a determination that the claim is founded upon a money-mandating source and the plaintiff has made a nonfrivolous allegation that it is within the class of plaintiffs entitled to recover under the money-mandating source.  There is no further jurisdictional requirement that the court determine whether the additional allegations of the complaint state a nonfrivolous claim on the merits.").  Accordingly, the court addresses the government's argument as alleging that BP has failed to state a claim upon which relief can be granted.  Pl.'s Opp'n at 14-15.

"[N]o statutory obligation to pay money . . . can create a property interest within the meaning of the Takings Clause."  *Adams v. United States*, 391 F.3d 1212, 1225 (Fed. Cir. 2004).  Nevertheless, a property interest has been found to exist in interest that has accrued on a claimant's principal.  *See Phillips v. Washington Legal Found.*, 524 U.S. 157, 166-69 (1998) (finding that interest accrued on the principal in a trust account constituted private property of the owner of the principal).  In distinguishing a statutory entitlement that creates a property interest from one that does not, the Federal Circuit noted the difference between "an actual sum of money representing interest derived from ownership of particular deposits in an established account, as opposed to some abstract sum of money capable of being calculated."  *Adams*, 391 F.3d at 1225.  The "lack of immediate right [to deposited funds] does not automatically bar a

claimant ultimately determined to be entitled to all or a share of the fund from claiming a proper share of the interest . . . that is realized in the interim." *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 161-62 (1980).

In this instance, BP's claim to a property right in interest may be distinct from a monetary entitlement pursuant to statute, and BP may have stated a plausible claim for relief under the Takings Clause if the FAST Act does have retroactive effect.[17]  It is undisputed that BP overpaid royalties.  Compl. ¶¶ 14, 18, 28, Ex. 1 at 10-11, 16.  Under the Royalty Management Act prior to amendment by the FAST Act, interest began to accrue from the date of overpayment.  *See* 30 U.S.C. § 1721(h) (2012).  Interest accrued on the overpayment principal until at least December 3, 2015, and, if final action had occurred by then, would have been paid to BP.  BP's entitlement to interest is derivative from its overpayment.  To the extent it has a property interest in the overpayment principal, it may thus have a property interest in the overpayment interest as well.  Thus, BP can plausibly claim a property interest in what had already accrued to prior to enactment of the FAST Act.  Retroactive effect of the FAST Act may then have affected a taking, having separated BP from part of its money.  While BP's overpayment is not held in an account owned by BP, BP's right to a refund of an overpayment seems more akin to a return of BP's property than to a statutory obligation to payment by the government.  The Royalty Management Act refers to overpayments as "principal," *e.g.*, 30 U.S.C. § 1702(25) (defining "obligation" to include "any duty of the Secretary . . . to pay, refund, offset, or credit monies including . . . the principal amount of any royalty . . . ."); *see also* 30 U.S.C. §§ 1721a(a)(2)(A), 1724(b)(1), 1724(h)(2), a characteristic that has distinguished a property interest from mere obligations to pay, *compare Phillips*, 524 U.S. at 166-168, *and Webb's Fabulous Pharmacies*, 449 U.S. at 160-62, *with Adams*, 391 F.3d at 1220-23.  Further, a refund is not merely a statutory right to payment, but a "*return* of an overpayment."  30 U.S.C. § 1702(30) (emphasis added).

The Federal Circuit rejected a similar argument in *Getty Oil Co. v. United States*, 767 F.2d 886 (Fed. Cir. 1985), but in light of the Royalty Simplification Act, that rationale may no longer hold.  Getty sued for approximately $364,000 in interest derived from approximately $775,000 in overpaid royalties relating to offshore oil and gas leases.  *Id.* at 887.  Getty alleged that the government's use of its money for three years without paying interest constituted a taking.  *Id.* at 887-88.  In rejecting Getty's allegation, the court noted that "[w]hile Getty's argument would make sense to any banker or economist, or even to the typical taxpayer, [the court was] bound by judicial precedent and the Constitution; authorities that do not go so far as Getty contends."  *Id.* at 888.  Specifically, the court observed that no statutory or contractual provision mandating interest on overpayments existed at that time, *id.* at 887, 889, and "Getty's payments were never put in a designated account where they specifically earned interest," *id.* at 888.  Also the specific statute under which Getty sued expressly barred paying interest, and "any waiver of sovereign immunity must be strictly construed."  *Id.* at 889.  Unlike Getty's overpayment, BP's overpayment was earning interest until at least December 3, 2015, and sovereign immunity had been waived until December 3, 2015.

---

[17]If the FAST Act does not have retroactive effect, then BP's remedy would be pursuant to the terms of the Royalty Management Act.

Because the government's obligation to pay interest arises from statute, Congress is free to change the terms and cut off future liability.  *See, e.g.*, *Marathon Oil v. United States*, 374 F.3d 1123, 1126-27 (Fed. Cir. 2004) (discussing the no-interest rule absent express waiver of sovereign immunity).  Unlike the trust accounts in *Phillips* where the government took interest for public use that had accrued to a depositor by an arrangement with a private bank, the government here is the source of interest and can dictate the terms of future interest accrual.

Whether BP has a property interest in interest that had accrued prior to enactment of the FAST Act presents questions of law for which a decision is premature, especially since the retroactive effect of the FAST Act remains undetermined.  Accordingly, BP can maintain a Takings claim for interest that had accrued up to enactment of the FAST Act, but not for interest thereafter.

## CONCLUSION

For the foregoing reasons, the court concludes that it has jurisdiction under the Royalty Management Act to hear BP's Tucker Act claims for a denied refund and interest on its overpayments.  The government's motion to dismiss the complaint for lack of subject-matter jurisdiction is DENIED.

BP has provided sufficient legal and factual support to constitute a plausible claim for (1) its refund and interest request under the money-mandating provisions of the Royalty Management Act and (2) a taking of interest under the Fifth Amendment's Takings Clause. Even so, because the Royalty Management Act provides a remedial scheme and dictates entitlement to interest on overpayments, BP's independent contract claim set out in Count III cannot survive and must be dismissed.  Count IV may be maintained with respect to interest that accrued up to December 3, 2015.  Accordingly, the government's motion to dismiss for failure to state a claim is GRANTED in part and DENIED in part.

The government shall file its answer to BP's complaint by April 24, 2019.

It is so **ORDERED**.

s/ Charles F. Lettow
Charles F. Lettow
Senior Judge