# In the United States Court of Federal Claims

No. 18-972C

(Filed:  March 18, 2020)

| | | |
|---|---|---|
| **BP EXPLORATION & PRODUCTION INC.**, | ) ) ) | Suit to recover leasehold royalty overpayments and interest; Federal Oil and Gas Royalty Management Act, 30 |
| Plaintiff, | ) ) | U.S.C. §§ 1701-59, as amended by the Federal Oil and Gas Royalty |
| **v.** | ) ) ) | Simplification and Fairness Act and the Fixing America's Surface |
| **UNITED STATES**, | ) ) ) | Transportation Act of 2015; statutory interpretation; Federal Savings Statute, 1 |
| Defendant, | ) ) ) | U.S.C. § 109 |

Jonathan A. Hunter, Jones Walker LLP, New Orleans, Louisiana, for plaintiff.  With him on the briefs was Sarah Y. Dicharry, Jones Walker LLP, New Orleans, Louisiana.

Tanya B. Koenig, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant.  With her on the briefs were Joseph H. Hunt, Assistant Attorney General, Civil Division, and Robert E. Kirschman, Jr., Director, and Allison Kidd-Miller, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.  Of counsel was David Kearney, Attorney-Advisor, Rocky Mountain Regional Solicitor's Office, United States Department of the Interior, Lakewood, Colorado.

## OPINION AND ORDER

LETTOW, Senior Judge.

Plaintiff BP Exploration & Production, Inc. ("BP") has brought suit against the United States (the "government") acting through the Department of the Interior's Office of Natural Resources Revenue ("ONRR") to recover overpayments of royalties made to the government pursuant to lease agreements on oil and gas leases in the Gulf of Mexico.  The government refunded some, but not all, of the overpaid royalties claimed by BP and refused to pay interest on the amount refunded.  This dispute turns on dueling interpretations of complex, interrelated sections of Title 30 of the United States Code concerning royalty disputes, specifically those adopted as part of the Federal Oil and Gas Royalty Management Act of 1982 ("Royalty Management Act"), Pub. L. No. 97-451, 96 Stat. 2447 (codified at 30 U.S.C. § 1701-59), as amended by the Federal Oil and Gas Royalty Simplification and Fairness Act ("Royalty Simplification Act"), Pub. L. No. 104-185, 110 Stat. 1700 (1996).

On April 8, 2019, the court denied the government's motion for dismissal on jurisdictional grounds and set a legal framework for consideration of the merits. *See generally BP Expl. & Prod., Inc. v. United States*, 142 Fed. Cl. 579 (2019). The United States then filed the administrative record on July 22, 2019, *see* ECF No. 30, and BP subsequently filed a motion for judgment on the administrative record, *see* Pl.'s Mot. for Judgment on the Admin. R. ("Pl.'s Mot."), ECF No. 37. The issues have been fully briefed, *see* Def.'s Resp. and Cross-Mot. for Judgment on the Admin. R. ("Def.'s Cross-Mot."), ECF No. 42; Pl.'s Reply & Resp. to Def.'s Mot. ("Pl.'s Resp."), ECF No. 43; Def.'s Reply to Pl.'s Resp. ("Def.'s Reply"), ECF No. 44, and the court held a hearing on March 3, 2020.

The court concludes that BP timely filed its claim because the seven-year statute of limitations set out at 30 U.S.C. § 1724(b)(1) governs here. And, because the amendments related to interest in Fixing America's Surface Transportation Act of 2015 ("FAST Act"), Pub. L. No. 114-94, Div. C, Title XXXII, § 32301, 129 Stat. 1312, do not apply retroactively and did not curtail the accrual of interest on preexisting obligations, BP is also entitled to collect the interest that accrued from the time BP made its overpayments until those payments were or are refunded. Accordingly, BP's motion for judgment on the administrative record is GRANTED and the government's cross-motion is DENIED.

## FACTS[1]

### A.  *The Royalty Payment Audit*

BP and the United States are party to lease agreements pertaining to oil and gas fields situated in the Gulf of Mexico, and pursuant to those agreements, BP is obligated to pay the United States royalties in proportion to the value of oil and gas it produces from those fields. *See* Def.'s Cross-Mot. at 5. Regulations promulgated by ONRR authorized BP to reduce the value of oil and gas produced, and thus the amount of royalties owed, by deducting allowable expenses, including some costs relating to transportation infrastructure and operation. *Id.*; Pl.'s Mot. at 9-10.

The Royalty Management Act vested the Department of the Interior with authority to "implement and maintain a royalty management system for oil and gas leases." 30 U.S.C. § 1701(b)(2). Subsequently, the Royalty Simplification Act added procedures for conducting audits and requesting corrections of overpayments and underpayments. *See* Pub. L. 104-185, 110 Stat. 1700. The latter Act also set a limitation on the amount of time for the agency to issue a final decision on demands by lessees. *See id.* The Royalty Simplification Act authorized lessees to recover interest on overpayment refunds, but that provision was repealed nearly two decades later by the enactment of the FAST Act § 32301.

On February 7, 2009, ONRR initiated "an audit of transportation allowances deducted from royalties paid on [f]ederal offshore properties transported through [BP's] Na Kika Subsea

---

[1]The recitations that follow constitute findings of fact by the court from the administrative record filed pursuant to Rule 52.1(a) of the Rules of the Court of Federal Claims ("RCFC").

2

Complex" during the 2006 calendar year.  AR 2-3.[2]  In the course of that audit, ONRR expanded its scope to include the period January 1, 2004 through December 31, 2007 and to cover additional BP properties.  AR 49-399.  The transportation allowances BP had reported on a monthly basis for these periods were estimations, and BP intended to revise its original filings within the applicable adjustment period to include costs that it had not previously deducted.  *See* AR 57-564.  Throughout the course of the audit, BP communicated to ONRR's auditors that it intended to include these additional costs in the transportation allowances.  AR 57-564.  Because such adjustments were anticipated during the audit, some increasing and others decreasing the amount of the allowance, the parties agreed that BP would wait to submit formal adjustment requests until both sides had consulted and agreed on the necessary alterations, thereby streamlining the process.  AR 57-573.

The Royalty Management Act imposes limitations on the periods in which the government and BP may seek corrections to past royalty payments.  *See* 30 U.S.C. §§ 1721a(a)(4) (setting a six-year adjustment period),[3] 1724(b)(1) (setting a seven-year limitation period).[4]  The statute also permits the government and a lessee to toll the applicable period by a

---

[2]The administrative record is consecutively paginated, and citations to the record are cited by tab and page as "AR __-__."

[3]Paragraph 1721a(a)(4) provides:

(4) For purposes of this section, the adjustment period for any obligation shall be the six-year period following the date on which an obligation became due.  The adjustment period shall be suspended, tolled, extended, enlarged, or terminated by the same actions as the limitation period in section 1724 of this title.

30 U.S.C. § 1721a(a)(4).

[4]Subsection 1724(b) provides:

(b) Limitation period

(1) In general

*A judicial proceeding or demand* which arises from, or relates to an obligation, *shall be commenced within seven years from the date on which the obligation becomes due* and if not so commenced shall be barred.  If commencement of a judicial proceeding or demand for an obligation is barred by this section, the Secretary, a delegated State, or a lessee or its designee (A) shall not take any other or further action regarding that obligation, including (but not limited to) the issuance of any order, request, demand or other communication seeking any document, accounting, determination, calculation, recalculation, payment, principal, interest, assessment, or penalty or the initiation, pursuit or completion of an audit with respect to that obligation; and (B) shall not pursue any other equitable or legal remedy, whether under statute

written agreement.  30 U.S.C. §§ 1721a(a)(4), 1724(d).  Between 2010 and 2013, BP and ONRR executed a series of seven agreements tolling statutes of limitations, including those in Paragraph 1721a(a)(4) and Subsection 1724(d).  *See generally* AR 9.  Executed November 19, 2010, the first agreement applied to the Na Kika properties and tolled the period from November 1, 2003 through December 31, 2010.  AR 9-45.  The second, third, fourth, and sixth agreements covered the so-called "Deepwater Properties" (which collectively refers to a series of different properties subject to BP leases) from January 1, 2004, *see* AR 9-46, through February 15, 2014, *see* AR 9-53.[5]  The fifth and seventh agreements covered the Mad Dog property from April 1, 2006, *see* AR 9-52, through February 15, 2014, *see* AR 9-55.  In sum, the agreements tolled the statute of limitations for the Na Kika properties from November 1, 2003 through February 15, 2014; the Deepwater Properties from January 1, 2004 through February 15, 2014; and the Mad Dog property from April 1, 2006 through February 15, 2014.  None of the agreements included the Mica property.  AR 71-1123.

ONRR notified BP via email on July 13, 2013 that it was closing the audit and would send BP the audit report.  *See* AR 35-360.  Issued on November 18, 2013, the report summarized ONRR's conclusions concerning BP's underpayments and directed BP to "complete and report/adjust transportation allowance[s] for Na Kika from January 2008 forward and for other Federal Offshore Deepwater properties from January 2004 forward."  AR 57-753.  After issuing the audit report, ONRR continued to make inquiries about audit-related matters as late as June 2014, *see, e.g.*, AR 57-583, leading BP to assert that the audit proceeded until at least that time, *see* Pl.'s Mot. at 14.

### B.  BP's Refund Demands

In August 2013, before ONRR issued the audit report, the auditors informed BP that they interpreted the tolling agreements to operate in a one-sided fashion by extending the time for ONRR to recover royalty underpayments but not the time for BP to recover overpayments.  *See* AR 57-579.  Although the ONRR Director would later reject this interpretation of the tolling agreements, the communication engendered concerns for BP that its right to overpayment refunds could end up being time-barred, leading to BP's decision to submit two refund demands outside of the audit process.  *See* Pl.'s Mot. at 14.  On November 13, 2013, BP sent a letter to the Secretary of the Interior and the Director of ONRR demanding a refund of $6,955,581.89 plus interest for royalty overpayments related to the Na Kika and Holstein properties for January 2004

---

or common law, with respect to an action on or an enforcement of said obligation.

30 U.S.C. § 1724(b) (emphasis added).

[5]Several of the tolling agreements covering the Deepwater Properties clarify the precise properties included within that collective grouping by furnishing an attachment containing a listing of the individual properties and related lease identification numbers.  *See, e.g.*, AR 9-51.  Encompassed within the Deepwater Properties are the Na Kika properties and the Holstein property, but the Mad Dog and Mica properties are not among the Deepwater Properties.  *See* AR 9-51.

through August 2007. *See* AR 51-438, 442. BP sent a second letter on February 12, 2014, demanding a refund of $6,619,730.51 plus interest for royalty overpayments for January 2004 through December 2007. *See* AR 52-453. The leases at issue in the second demand included several Deepwater Properties, the Mad Dog and Mica properties, and additional refunds attributable to the Holstein property. *See* AR 52-458. The refunds BP demanded related to deductible transportation costs that had not been previously deducted but were identified although not addressed during the audit. AR 57-580 to 581. Both letters stated that they should be considered "a formal 'demand' for purposes of 30 U.S.C. §§ 1721a(b)(1)(A) and 1724(b)(1)." AR 51-438; AR 52-453.

In February and June 2014, ONRR sent letters partially granting BP's refund demands but denying them insofar as they included costs incurred outside a statute of limitations. *See generally* AR 54; AR 55. ONRR never disputed that the costs in question qualified as deductible transportation costs, only that some of the demands were untimely. AR 57-581. Declining to concede the effectiveness of the tolling agreements in preserving those claims, ONRR asserted that the agreements only operated in favor of the government's claims for underpayments and would therefore not preserve BP's claims for overpayments. *See* AR 54-478; AR 55-507. Applying the seven-year period specified in Section 1724(b), ONRR concluded that BP could only receive refunds for overpayments made within seven years of its demand. *See* AR 54-478; AR 55-507.

Accordingly, ONRR denied refunds for costs incurred more than seven years from the dates of BP's requests but granted those within that time. *See* AR 54-478; AR 55-507. Therefore, regarding BP's November 2013 claim covering the Na Kika and Holstein properties, ONRR granted refunds for October 2006 through August 2007, but rejected refunds covering January 2004 through September 2006. AR 54-475. Regarding BP's February 2014 claim for the Deepwater, Holstein, Mad Dog, and Mica properties, ONRR granted refunds for January 2007 through December 2007, but rejected refunds for January 2004 through December 2006. AR 55-503. In total, ONRR refunded BP $5,556,497.32 of the $13,575,312.40 claimed, plus interest. AR 74-1161. BP appealed the decision to the ONRR Director in October 2014. *See* AR 74.

### C. The Appeal to the Director of ONRR

Three years after BP filed its appeal, on December 11, 2017, the ONRR Director issued a decision granting partial relief. *See* AR 71-1118. While the decision resulted in a net benefit for BP, it reversed some of the relief that had been granted by ONRR's initial decision. First, the Director rejected ONRR's one-sided interpretation of the tolling agreements, concluding that the agreements bilaterally preserved both ONRR's ability to demand payment of royalties and BP's ability to request refunds. *See* AR 71-1127 to 1128. Second, under that bilateral interpretation of the tolling agreements, the Director then addressed which of the two limiting time periods applied to BP's refund demands. Recognizing the effect of adopting one period over the other, he noted that BP's demands "would be timely for all months if subject to the seven-year limitation period in 30 U.S.C. § 1724(b)(1) . . . . [, b]ut if the six-year adjustment period . . . applies, some months would still be untimely." AR 71-1128.

Reversing ONRR's initial decision, the Director concluded that the pertinent statute of limitations was not the seven-year limitation period of Paragraph 1724(b)(1) but the six-year adjustment period of Paragraph 1721a(a)(4). *See* AR 71-1131. That conclusion rested on the premise that "[t]o allow *all* lessee refund requests as long as the request was within seven years after the obligation becomes due would render § 1721a superfluous and meaningless." AR 71-1129 (emphasis in original). Instead, the Director reasoned that "a lessee may request a refund after the six-year adjustment period, as extended by any tolling agreement, *only* if it meets the requirements outlined in § 1721a(a)(3)." AR 71-1129. (emphasis in original). That paragraph contains three requirements: (1) the lessee must provide written notice to the Secretary; (2) the request must be made during an audit of the period which includes the production month for which the adjustment is made; and (3) the Secretary must approve the request. *See* 30 U.S.C. § 1721a(a)(3).[6] The Director rejected BP's position that the audit extended well into 2014, noting that the government's requests for information after it notified BP that it was closing the audit in July 2013 simply sought to verify corrections BP had provided during the audit. *See* AR 71-1131. Accordingly, the Director concluded that because BP's November 2013 and February 2014 demands occurred after the audit closed in July 2013, it "did not meet § 1721a(a)(3)'s requirement that any refund request submitted after the adjustment period be made during an audit of the production month at issue." AR 71-1130 to 1131. Having ruled that the seven-year period did not apply to BP's refund demands, the Director applied the six-year period, finding ineligible for refund the first five months of the Na Kika demand, the first nine months of the 2013 Holstein demand, and the first twelve months of the Deepwater Properties demand. AR 71-1134. Additionally, the remaining months previously excluded by the unilateral interpretation of the tolling agreements were now deemed eligible, *see* AR 71-1128, and the Director accordingly granted a refund of $6,736,368, leaving $1,282,447 not refunded, *see BP Expl. & Prod., Inc.*, 142 Fed. Cl. at 587. Notably, had the seven-year period rather than the six-year period been applied, the remaining $1,282,447 disallowed by the Director would have been timely. *Id.*

The Director next turned to refunds relating to the Mica and Mad Dog properties that ONRR had previously allowed. Noting that no tolling agreement covered the Mica property, the Director determined that the refund demand was untimely, thereby disallowing any refund associated with that property. *See* AR 71-1132 to 1133. Similarly, the Mad Dog property was listed in the May 2013 and December 2013 tolling agreements, but the Director noted that the extended adjustment period from the time of BP's February 2014 demand only reached back to

---

[6]Paragraph 1721a(a)(3) provides:

       (3) An adjustment or a request for a refund for an obligation may be made after the adjustment period only upon written notice to and approval by the Secretary or the applicable delegated State, as appropriate, during an audit of the period which includes the production month for which the adjustment is being made. If an overpayment is identified during an audit, then the Secretary or the applicable delegated State, as appropriate, shall allow a credit or refund in the amount of the overpayment.

30 U.S.C. § 1721a(a)(3).

the last nine months of 2007, but ONRR had granted the refund request for production months January through March 2007.  *See* AR 71-1133.  Therefore, the Director disallowed the previously approved refund relating to the Mad Dog property for January through March 2007. Acting on those determinations, the Director held that ONRR's initial refund of $254,338 relating to these properties was improper and had to be returned to the government.  *See BP Expl. & Prod., Inc.*, 142 Fed. Cl. at 587.  This outcome also assumed the application of the six-year limitation period, but had the seven-year period urged by BP been applied, the request would have been timely, and BP would not have been obligated to return the $254,338.  *Id.*

Finally, the Director addressed whether BP was entitled to interest on the $6,736,368 refunded pursuant to the appeal.  In December 2015, while BP's appeal before the ONRR Director was pending, Congress passed the FAST Act, which amended 30 U.S.C. § 1721 by repealing the provisions that had previously authorized ONRR to pay interest on royalty overpayment refunds.  *See* FAST Act § 32301; *see also* 30 U.S.C. § 1721(h) (2012).[7]  The Director noted that the Anti-Deficiency Act, codified in part at 31 U.S.C. § 1341(a)(1)(A), prohibits federal agencies from making any expenditure not authorized by law, and he reasoned that because the FAST Act repealed ONRR's statutory authority to pay interest on royalty overpayment refunds, the Anti-Deficiency Act therefore prohibited ONRR from paying interest on refunds granted after the FAST Act's effective date, even if such refunds were requested and interest had accrued prior to that time.  AR 71-1131 to 1132.  Consequently, the Director declined to award BP interest on the additional refund.  AR 71-1132.  Notably, the FAST Act was enacted during the pendency of BP's appeal to the ONRR Director; thus, had ONRR

---

[7]Before repeal, Subsection 1721(h) provided:

(h) Lessee or designee interest

Interest shall be allowed and paid or credited on any overpayment, with such interest to accrue from the date such overpayment was made, at the rate obtained by applying the provisions of subparagraphs (A) and (B) of section 6621(a)(1) of Title 26, but determined without regard to the sentence following subparagraph (B) of section 6621(a)(1).  Interest which has accrued on any overpayment may be applied to reduce an underpayment.  This subsection applies to overpayments made later than six months after August 13, 1996, or September 1, 1996, whichever is later. Such interest shall be paid from amounts received as current receipts from sales, bonuses, royalties (including interest charges collected under this section and rentals of the public lands and the Outer Continental Shelf under the provisions of the Mineral Leasing Act [30 U.S.C.A. § 181 et seq.], and the Outer Continental Shelf Lands Act [43 U.S.C.A. § 1331 et seq.], which are not payable to a State or the Reclamation Fund.  The portion of any such interest payment attributable to any amounts previously disbursed to a State, the Reclamation Fund, or any other recipient designated by law shall be deducted from the next disbursements to that recipient made under the applicable law.  Such amounts deducted from subsequent disbursements shall be credited to miscellaneous receipts in the Treasury.

30 U.S.C. §1721(h) (2012).

initially interpreted the tolling agreements in a bilateral manner, as the Director did on appeal, the interest on these subsequently refunded amounts would presumably have been paid out in 2014 prior to the enactment of the FAST Act. *See* Pl.'s Mot. at 17.

### D.     The Appeal to the Interior Board of Land Appeals

BP appealed the Director's decision to the Interior Board of Land Appeals ("Board of Land Appeals"). *See* AR 74. The Royalty Management Act provides that if the Secretary of the Interior (the "Secretary") does not issue a final decision within 33 months from the date the proceeding commences, the Secretary is presumed to have issued a decision affirming the agency's prior decision. 30 U.S.C. § 1724(h). That 33-month period ended in early 2018, and the Board of Land Appeals accordingly dismissed the appeal for lack of jurisdiction on June 21, 2018. *See* AR 84. The Secretary was therefore deemed to have affirmed the Director's decision (1) denying BP's refund demand of approximately $1,282,447 based on the application of the six-year rather than the seven-year limitations period; (2) requiring that BP return approximately $254,338 relating to the Mad Dog and Mica refunds previously granted by ONRR; and (3) denying interest attributable to overpayment refunds that had been disallowed by ONRR based on a unilateral interpretation of the tolling agreements but permitted by the Director based on a bilateral interpretation. BP sought judicial review in this court on July 6, 2018.[8]

## STANDARDS FOR DECISION

### A.     Review in Accord with the Administrative Procedure Act

Under the Rules of the Court of Federal Claims, "[w]hen proceedings before an agency are relevant to a decision in a case, the administrative record of those proceedings must be certified by the agency and filed with the court." RCFC 52.1(a). A claim made pursuant to a money-mandating statute invokes this court's Tucker Act jurisdiction, 28 U.S.C. § 1491, and when such a claim challenges agency action, the court must proceed by reviewing the agency's decision under the standards of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, rather than conducting a *de novo* determination of the facts. *See BP Expl. & Prod., Inc.*, 142 Fed. Cl. at 593. Here, as previously noted in the court's prior decision denying the government's motion to dismiss, "the court is exercising jurisdiction under the Tucker Act, and will review the underlying agency decision pursuant to the standards of the APA and RCFC 52.1, just as it would for a government procurement case or a military pay or disability case." *Id.*

This court reviews decisions of the Board of Land Appeals under the same standards it applies in other types of cases implicating the APA. *See Foote Mineral Co. v. United States*, 654 F.2d 81, 85 (Ct. Cl. 1981). Under the APA, the court may set aside an agency decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency's action is arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of

---

[8]BP's suit in this court was timely. A lessee may seek judicial review within 180 days of receipt of notice of final agency action. *See* 30 U.S.C. § 1724(h)(2), (j).

the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  In conducting its review, "[t]he court may not 'substitute its judgment for that of the agency,'" *Hyperion Inc. v. United States*, 115 Fed. Cl. 541, 550 (2014) (quoting *Keeton Corrs., Inc. v. United States*, 59 Fed. Cl. 753, 755 (2004) (in turn quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds as recognized in Califano v. Sanders*, 430 U.S. 99, 105 (1977))), and "must uphold an agency's decision against a challenge if [it] 'provided a coherent and reasonable explanation of its exercise of discretion,'" *id*. (citing *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009)).

### B.  Standards for Evaluating on Agency's Interpretation of a Statute

The *Chevron* doctrine sets forth a two-part inquiry which this court must generally apply when reviewing agency interpretations of a statute.  *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984); *see also PDS Consultants, Inc. v. United States*, 907 F.3d 1345, 1355 (Fed. Cir. 2018).  Under *Chevron*, a court reviewing an agency's construction of a statutory provision that it administers must first determine "whether Congress has directly spoken to the precise question at issue."  467 U.S. at 842.  If Congress has done so, the analysis goes no further, and the reviewing court must give effect to the unambiguous intent of Congress.  *Id.* at 842-43.  In other words, the reviewing court owes an agency's interpretation no deference unless it is unable to discern the meaning of the statute after "employing traditional tools of statutory construction."  *SAS Inst., Inc. v. Iancu*, ___ U.S. ___, ___, 138 S. Ct. 1348, 1358 (2018) (quoting *Chevron*, 467 U.S. at 843 n.9).  If, however, the statute is ambiguous, capable of more than one reasonable interpretation, then the court must proceed to the second step of the *Chevron* analysis and defer to the agency's construction of the statute so long as it is a reasonable one. *Chevron*, 467 U.S. at 843.

## ANALYSIS

### A.  Statutory Interpretation

The government does not dispute that BP's refund demands would have been appropriate had they been timely.  Indeed, if the ONRR Director—after reversing ONRR and concluding that the tolling agreements were bilateral—had applied the same seven-year period that ONRR initially considered relevant, then the demands would have been timely, and the Director would presumably have granted BP's demands.[9]  Instead, the Director rejected ONRR's initial reading of the statutory provisions and applied the six-year period, thereby rejecting the claims as untimely even when applying the tolling agreements bilaterally.  Therefore, whether BP is

---

[9]Both the ONRR Director's decision and the government in this litigation concede that the requests "would be timely for all months if subject to the seven-year limitation period in 30 U.S.C. § 1724(b)(1), as extended by the tolling agreements," AR 71-1128; *see also* Hr'g Tr. 64:3-8 (Mar. 3, 2020).

The date will be omitted from further citations to the transcript of this hearing.

entitled to recover its asserted royalty overpayment refunds hinges ultimately on which statute of limitations applies to BP's demands, and that question is a matter of statutory interpretation.

### 1. Deference.

The government asserts that the statutory framework unambiguously supports its reading but maintains that even if the court disagrees and finds the statute ambiguous, then it is obligated pursuant to *Chevron* to defer to the agency's reasonable construction of the relevant statutory provisions. *See* Def.'s Cross-Mot. at 18-19. BP counters that the unambiguous meaning is just the opposite of what the government posits but asserts that, regardless, the agency's interpretation does not warrant deference. *See* Pl.'s Reply at 3-4. Instead, if the court finds the statutes to be ambiguous, BP would have it decline to apply *Chevron* because the agency has been inconsistent in its approach. *Id.*

The underlying rationale of the *Chevron* doctrine is that a statutory ambiguity might represent an implied congressional delegation of authority for the agency to fill gaps and provide further elucidation of meaning, rendering the agency's ensuing interpretation binding on courts "unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute." *United States v. Mead Corp.*, 533 U.S. 218, 227 (2001) (citations omitted). Based upon that premise, "[t]he fair measure of deference to an agency administering its own statute has been understood to vary with circumstances," and among the factors courts consider in making that determination is the consistency of the agency's position. *Id.* at 228 (citation omitted); *see also Federal Election Comm'n v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 37 (1981) ("[T]he thoroughness, validity, and consistency of an agency's reasoning are factors that bear upon the amount of deference to be given an agency's ruling."). Well before the *Chevron* regime—when courts respected agency interpretations while likewise retaining authority to exercise independent judgment over them—an interpretive pedigree carried significance, and the Supreme Court "declined to give weight to executive interpretations" that had "not been uniform." *Baldwin v. United States*, 589 U.S. __, __, 140 S. Ct. 690, 693, (2020) (Thomas, J., dissenting from denial of certiorari) (quoting *Merritt v. Cameron*, 137 U.S. 542, 552 (1890)). Thus, post-*Chevron*, "[a]n agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference' than a consistently held agency view." *Immigration and Naturalization Serv. v. Cardoza-Fonseca*, 480 U.S. 421, 446 n.30 (1987) (quoting *Watt v. Alaska*, 451 U.S. 259, 273 (1981)). Nonetheless, inconsistent interpretations do not necessarily render *Chevron* inapplicable *per se* because "[h]ow much weight should be given to the agency's views . . . will depend on the facts of individual cases." *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 417 (1993) (citation omitted).

Here, the circumstances of the agency's inconsistent interpretations counsel against affording it deference. To begin, the Director's decision itself constituted a reversal of ONRR's previous decision to apply the seven-year period rather than the six-year period in this very case. And that change by the Director constituted a reversal of what had apparently been ONRR's typical approach. BP identifies at least three occasions where ONRR reflexively applied the seven-year period of Section 1724(b) in denying refund demands that extended back further than

seven years.  *See* Pl.'s Reply Exs. 1-3.[10]  Notably, in each of these cases, applying the longer period was hardly a moot point because application of the six-year period would have resulted in a smaller refund.  *See id.*

       Furthermore, the inconsistency in this instance represents a change implicating the agency's own financial interest.  The Director adopted an interpretation that was both contrary to its prior approach and redounded to ONRR's financial benefit by narrowing its liability for overpayment refunds.  *See Amalgamated Sugar Co. LLC v. Vilsack*, 563 F.3d 822, 834 (9th Cir. 2009) (noting that, while not an automatic rebuttal of deference, "[w]here an agency interprets or administers a statute in a way that furthers its own administrative or financial interests, the agency interpretation must be subject to greater scrutiny").

       In sum, the Director's decision respecting applicability *vel non* of the statutes of limitations will not be accorded deference.

       *2.  The government's and BP's conflicting interpretations.*

       In this court, the government and BP offer conflicting readings of the statutory provisions at issue.  BP's construction begins by differentiating two "categorically different types" of refund requests: an informal request for refund under Subsection 1721a(a) and a formal demand under Subsections 1721a(b) and 1724(b).  *See* Pl.'s Mot. at 21.  BP asserts that an informal request for refund under Paragraph 1721a(a)(1)[11] must be made within the six-year adjustment period[12]

---

       [10]Somewhat cryptically, the government counters that these three decisions "do not provide sufficient information to determine whether the six-year adjustment period would apply under ONRR's interpretation," Def.'s Reply at 5 n.3, by which it apparently means that the letters do not indicate whether audits of the relevant periods were ongoing when these demands were made.  But the government's oblique attempt to disregard these letters fails to support its assertion.  On their face, the letters nowhere suggest that the demands related to audits.

       The three decisions are set out in letters, as follows:  (1) Letter from Robert Prael, ONRR, to Kyle Silvio, Exxon Mobil (Mar. 5, 2015); (2) Letter from Robert Prael, ONRR, to Sharon Rodgers, Exxon Mobil (July 14, 2015); (3) Letter from Robert Prael, ONRR, to Ross Lanzini, Exxon Mobil (Apr. 18, 2014).  These letters and attendant correspondence are set out as exhibits to BP's reply.

       [11]Paragraph 1721a(a)(1) provides in part that, "If, during the adjustment period, a lessee . . . determines that an adjustment or refund request is necessary to correct an underpayment or overpayment of an obligation, the lessee . . . shall make such adjustment or request a refund within a reasonable period of time and only during the adjustment period."

       [12]Paragraph 1721a(a)(4) provides that, "For purposes of this section, the adjustment period for any obligation shall be the six-year period following the date on which an obligation became due."

subject to an extension beyond that time allowed for ongoing audits in Paragraph 1721a(a)(3).[13] *Id.* at 21-23.   Alternatively, as BP would have it, a formal demand under Subsection 1721a(b) "must satisfy formalities not required for a refund request under S[ubs]ection 1721a(a)," *id.* at 21, and must be made within the seven-year limitation period set forth in Paragraph 1724(b)(1).[14] The formalities required for a request to qualify as a formal demand are listed in Subparagraphs 1721a(b)(1)(A)-(D): the request must "(A) [be] made in writing to the Secretary and, for purposes of section 1724 of this title, [be] specifically identified as a demand; (B) identif[y] the person entitled to such refund; (C) provide[] the Secretary information that reasonably enables the Secretary to identify the overpayment for which such refund is sought; and (D) provide[] the reasons why the payment was an overpayment."  30 U.S.C. § 1721a(b)(1)(A)-(D).

BP supports drawing a distinction between requests for refund under Subsection 1721a(a) and formal demands under Subsection 1721a(b) in several ways, but it might well have summarized its arguments by resort to an incisive adage—things that are different are not the same.  First, BP notes that Subsection 1721a(b) expressly cross-references Section 1724 while Subsection 1721a(a) makes no mention of it.  *See* Pl.'s Mot. at 21.  Second, it emphasizes the difference in required formalities between the two subsections, noting that, quite unlike Subsection 1721a(b), a refund request under Subsection 1721a(a) "need not satisfy any formalities (other than when made after six years, having to be in writing)."  *Id.*  Third, the method for refunding royalty overpayments differs with respect to each subsection.  *Id.*  While Paragraph 1721a(a)(3) simply directs "the Secretary [of Interior] . . . [to] allow a credit or refund in the amount of the overpayment," Paragraph 1721a(b)(2) requires instead that the Secretary of the Treasury make the refund, but only after the Secretary of Interior certifies the amount to be paid, and then provides relatively detailed accounting guidance, specifying the precise sources from which the funds are to be paid.  *Id.*  Fourth, BP points to the particular legal consequences triggered by a Subsection 1721a(b) demand but not a Subsection 1721a(a) request.  *Id.*  BP identifies that these include (1) qualification as a "demand" under 30 U.S.C. § 1702(23);[15] (2) a

---

[13]Paragraph 1721a(a)(3) provides that, "An adjustment or a request for a refund for an obligation may be made after the adjustment period only upon written notice to and approval by the Secretary . . . during an audit of the period which includes the production month for which the adjustment is being made."

[14]Paragraph 1724(b)(1) provides in part that a "demand which arises from, or relates to an obligation, shall be commenced within seven years from the date on which the obligation becomes due and if not so commenced shall be barred."

[15]A demand is defined in part as:

> a separate written request by a lessee or its designee which asserts an obligation due the lessee or its designee that provides a reasonable basis to conclude that the obligation in the amount of the demand is due and owing, but does not mean any royalty or production report, or any information contained therein, required by the Secretary or a delegated State.

30 U.S.C. § 1702(23)(B).

120-day period for the agency to either pay or deny the request;[16] (3) the right to bring suit to enforce the obligation beyond the seventh year;[17] and (4) a 33-month period for resolving administrative appeals.[18]  Pl.'s Mot. at 21.

Finally, BP maintains that its "interpretation is consistent with the focus in [Paragraph] 1721a(a)(3) on the presence of an ongoing audit."  Pl.'s Mot. at 22.  In its view, the informal procedure of Subsection 1721a(a) "aligns with the give-and-take of the audit process," which in turn "provides a vehicle for resolving claims without the formalities of a S[ubs]ection 1721a(b) 'demand,'" enabling the parties to "work together" to make the necessary adjustments.  *Id.*  And, to illustrate how its reading of the statute plays out in actual practice, BP cites its own experience in cooperating with ONRR auditors to make adjustments throughout the process.  *Id.*

Consistent with this interpretation, BP asserts that its refund requests "satisfied the statutory requirements for the issuance of a formal 'demand,' [meaning] BP is entitled to recover its royalty overpayments made within seven years prior to its issuance of the demands, as extended by the [t]olling [a]greements."  Pl.'s Mot. at 23.

The government contends that BP's reading "is a too-simplistic interpretation," Def.'s Cross-Mot. at 16, and "incongruous with the language of the statute,"  Def.'s Reply at 7.  Dismissing BP's distinction between informal refund requests and formal demands, the government contends that, at least under Section 1721a, refunds are "a specific type of demand

---

[16]This paragraph provides that:
A refund under this subsection shall be paid or denied (with an explanation of the reasons for the denial) within 120 days of the date on which the request for refund is received by the Secretary.  Such refund shall be subject to later audit by the Secretary or the applicable delegated State and subject to the provisions of this chapter.

30 U.S.C. § 1721a(b)(3).

[17]This pertinent subsection provides:

In the event a demand subject to this section is properly and timely commenced, the obligation which is the subject of the demand may be enforced beyond the seven-year limitations period without being barred by this statute of limitations. . . .

30 U.S.C. § 1724(j).

[18]The statute commands that:

The Secretary shall issue a final decision in any administrative proceeding . . . within 33 months from the date such proceeding was commenced . . . .

30 U.S.C. § 1724(h)(1).

for the return of overpaid royalties," Def.'s Cross-Mot. at 16, and thus "*all* refunds for royalty overpayments must also be demands," Def.'s Reply at 7 (emphasis in original).  In the government's view, then, the aforementioned aphorism has no bearing here—things that are different really are the same.  Building on its conflation of refund requests and demands (at least respecting Section 1721a), the government insists that "to adopt BP's interpretation that all demands are subject to the seven-year limitations period would completely read out of [Section] 1721a the requirement that a lessee make an adjustment *or* refund request only during the adjustment period."  Def.'s Reply at 7 (internal quotations omitted) (emphasis in original).  The government likewise asserts that "BP also renders the entirety of [Subsection] 1721a(b) superfluous because, pursuant to BP's interpretation, all refund requests must be subject to the seven-year limitations period rather than the six-year adjustment period."  *Id.* at 8.  In sum, the government casts doubt on BP's reading by concluding that "[b]ecause the adjustment period applies to any adjustment or refund request, and because subsection (b) specifies that refund requests under this section must be identified as demands, the adjustment period applies not only to adjustments, but also at least to some demands as well."  Def.'s Cross-Mot. at 16 (internal quotations omitted).

The government supports its proffered interpretation by pointing to the canon of statutory construction that the specific governs the general.  Def.'s Cross-Mot. at 16.  As applied here, "the limitations period for demands in [Paragraph] 1724 is the general rule," but "the adjustment period applies specifically to one type of demands—refunds of royalty overpayments, as long as they meet the other requirements of [Section] 1721a(b)(1)."  *Id* at 17.  That leads the government to conclude that all refund requests made under Section 1721a must also be demands, and "a demand for a refund of a royalty overpayment is subject to the six-year adjustment period rather than the seven-year limitations period," *id.*, although it declines to take a position on what other types of demands might be subject to the seven-year period, *id.* at n.5.

The government does allow that demands made under Section 1721a might sometimes fall within the seven-year period, but only those that fall within the exception in Paragraph 1721a(a)(3).  Def.'s Cross-Mot. at 19.  That paragraph provides that a lessee may request an adjustment or refund outside of the six-year adjustment period "only upon written notice to and approval by the Secretary . . . during an audit of the period which includes the production month for which the adjustment is being made."  30 U.S.C. § 1721a(a)(3).  But the exception does not apply to BP's claims, the government contends, because they "were neither made during an audit nor covered by the audit."  Def.'s Cross-Mot. at 19.  Thus, the government concludes that while "the seven-year limitations period applies to both parties, [] refund demands within the scope of [Section] 1721a must also be made within the six-year adjustment period unless they fit within the exception provided by [Paragraph] 1721a(a)(3)."  Def.'s Reply at 7.

Both parties manage to underscore inadequacies in the other's interpretation, and the court finds that both offer a reading of the text of the statute that exhibits inconsistencies and conflicting overlaps.  For example, the government fails to proffer a cogent explanation for what meaning, if any, its reading would assign to Subsection 1721a(b) and its attendant cross-reference to Section 1724, if all refund requests are subject to the time constraints of Subsection 1721a(a).  The court hesitates to adopt a reading of statutory text that renders a significant portion of it largely meaningless or inexplicable, thereby violating "the cardinal principle of

14

statutory construction." *Williams v. Taylor*, 529 U.S. 362, 364 (2000).  Moreover, the government disregards the apparent differences in procedure between the two subsections, such as the requirement that payment must come from the Secretary of the Treasury in one case but not the other.  It also would permit auditors to disallow refund requests by lessees on the ground that they exceed the scope of the audit being conducted under Section 1721a and then preclude any recovery afterward by terminating the audit after the six-year period expires.  Nor is BP's interpretation immune from serious criticism.  BP is plainly correct that Subsection 1721a(a) must be different from Subsection 1721a(b), but its reading places excessive weight on form over substance.  BP's interpretation renders the time limitation of Paragraphs 1721a(a)(1) and (4) meaningless because at any time beyond the six-year period the lessee could simply evade that limit by labelling its request a demand, thereby unilaterally procuring itself the safe harbor of an additional year.  It seems doubtful, indeed illogical, that Congress would carefully craft a loophole that so blatantly swallows the rule.  Consequently, neither party offers an entirely satisfactory construction, but a third approach avoids these difficulties and is more consistent with the statute's plain meaning and structure.

       *3.  A construction faithful to the statutory text.*

        No court has yet been called upon to address the precise legal question of when to apply the six-year versus the seven-year limitation period.  As such, this is an issue of first impression, and, as it must, the court begins with the text of the statutory provisions involved.  *See Consumer Prod. Safety Comm'n v. GTE Sylvania*, 447 U.S. 102, 108 (1980) ("[T]he starting point for interpreting a statute is the language of the statute itself.").  That is enough to decide this case.

        Section 1721a is divided into two subsections that differ in important ways and noticeably implicate two distinct contexts.  Subsection 1721a(a) allows for certain kinds of adjustments or refund requests that can, as a general rule, occur "only during the adjustment period" of six years.  30 U.S.C. § 1721a(a)(1).  Significantly, Subsection 1721a(a) applies upon the existence of an audit.  That predicate is stated in Paragraph 1721a(a)(3), which allows a lessee, subject to notice and approval by the Secretary of Interior, to seek an adjustment or request a refund beyond the six-year period so long as it is made "during an audit of the period which includes the production month for which the adjustment is being made."  The rule making it impossible to seek a time extension after an audit has concluded strongly suggests that the statute contemplates that an audit, once initiated, encompasses all adjustments or refunds within the audit's scope requested under Subsection 1721a(a).  It follows then that the procedures and time limitations outlined in Subsection 1721a(a) are triggered when ONRR unilaterally initiates an audit, or potentially when an audit is triggered by a lessee's independent request for a refund, at least respecting costs included within the scope of the audit.

        That understanding of Subsection 1721a(a) becomes even more apparent when read in tandem with Subsection 1721a(b).  In the event that some overpayment amounts are not included within the scope of an audit, and thus do not fall within the processes of Subsection 1721a(a), Subsection 1721a(b) provides a vehicle for lessees to unilaterally seek a refund by submitting a refund demand.  Subsection 1721a(b) sets forth requirements for how to make a demand and, by explicit cross-reference, incorporates the seven-year time limitation in Section 1724 for doing so.

In sum, Subsection 1721a(a) applies when the overpayments at issue are subject to an ONRR audit and Subsection 1721a(b) applies to allow lessees to demand refunds when the overpayments are not subject to an audit. Such an interpretation follows logically from a plain reading of the statutory language and avoids the strains produced by the parties' proffered interpretations. Furthermore, it permits both subsections of Section 1721a to carry independent meaning, accounting for the differences in procedure and formality between the two.

### B.   BP's Claims Are Subject to the Seven-Year Limitations Period

The threshold question for determining which limitation period applies is thus whether the demands at issue concern overpayments that fall within or outside the scope of ONRR's audit. Under Subsection 1721a(a), requests within the scope of an audit must be brought within six years unless, during the audit, the Secretary of Interior approves a written notice requesting a refund. Under Subsection 1721a(b) and Section 1724, requests outside the scope of an audit must be brought within seven years. If the seven-year period applies, the court must then determine whether the demands satisfied the formal requirements of Subparagraphs 1721a(b)(1)(A)-(D). Here, the parties do not appear to contest that BP satisfied the procedural requirements of Subparagraphs 1721a(b)(1)(A)-(D) in submitting its demands.

BP's demands of November 2013 and February 2014 sought $1,282,447 and were denied as untimely by the ONRR Director. The Director noted first that the "requests would be timely for all months if subject to the seven-year limitation period," AR 71-1128, but decided that the six-year period governed, and so BP was not entitled to an extension beyond that time because it "did not file its [d]emands during an audit of the claimed costs," AR 71-1129. That conclusion was premised on the Director's dual determination that (1) the "[a]udit did not cover the costs" BP sought to include in its deduction and, even so, (2) the audit was closed before BP requested the refunds. AR 71-1128. Repeatedly, the Director emphasized that "none of the costs that BP now claims in its [d]emands were ever before ONRR to review as part of the Na Kika [a]udit." AR 71-1130. In the ensuing litigation before this court, the government has emphatically taken the same position, asserting that "all of BP's costs were outside the scope of the audit." Def.'s Cross-Mot. at 26. Indeed, that assumption is a core part of the government's position that BP could not seek an extension under its interpretation of Paragraph 1721a(a)(3). In the government's view, the costs were never eligible for the one-year extension because no audit ever considered them.

Because both the ONRR Director's decision and the government in this litigation adopt the premise that the disputed costs were not within the scope of any audit, the court need not consider how to determine the Na Kika audit's precise scope and breadth. Although in some cases addressing the particular and precise scope of an audit might well be a crucial or even dispositive question, this is not such a case because the government concedes the point.[19] It is significant to note, however, that the scope of a tolling agreement, even if entered into as a

---

[19]Notably, however, at oral argument the government seemed unable to provide any limiting principle to guide the court in determining the boundaries of audit scope. *See, e.g.*, Hr'g Tr. 47:17 to 54:5; 62:17 to 64:1.

consequence of an audit, does not serve to define the scope of the audit because tolling agreements are not necessarily coextensive with audits. Subsection 1721a(a)(4) permits the tolling of the audit adjustment period by incorporating the tolling provisions of Section 1724, which also operates to toll amounts *not* under audit, indicating that tolling agreements can function independently from audits and can include amounts either under audit or not under audit. As such, tolling agreements cannot reflexively be used to define the scope of an audit. Furthermore, there cannot be any question here that the tolling agreements at issue operated to toll the limitation period of both audited and unaudited costs because they expressly covered any limitation periods in both Sections 1721a and 1724. *See, e.g.*, AR 9-45. [20]

In sum, the costs in BP's demands were not subject to ONRR's audit and thus do not fall within the six-year limitation period of Subsection 1721a(a). Instead, the requests met the demand requirements of Subsection 1721a(b) and accordingly fall within the seven-year limitation period of Subsection 1724(b). It follows that the costs included in BP's demand letters are subject to the seven-year limitation period as extended, where applicable, by the tolling agreements. Therefore, consistent with the ONRR Director's recognition, applying the seven-year period renders BP's demands timely, at least insofar as they are included in the tolling agreements.

### C.  The Mica and Mad Dog Properties

BP next challenges the ONRR Director's decision ordering BP to repay[21] the refunds that ONRR, applying a seven-year statute of limitations, had previously allowed in relation to the Mica and Mad Dog Properties. *See* Pl.'s Mot. at 26. [22]  The Director first determined that, contrary to ONRR's original approach, the six-year statute of limitations governed refunds for

---

[20]The Director's decision, despite its flawed interpretation of Section 1721a, recognized that these tolling agreements included unaudited costs. *See* AR 71-1127 to 1128.

[21]In response to the Director's order, BP represents that it did return the amounts ordered to be refunded, "under protest . . . so that all the dollars at issue could be before [the court]." Hr'g Tr. 73:12-14.

[22]The precise amount at issue here is subject to inconsistencies that stem from what are apparently typographical errors in the parties' filings. For example, the complaint states that the refunded amount included $188,821 attributable to Mad Dog and $65,517 attributable to Mica, for a total of $254,338. Compl. ¶ 28. In its motion for judgment on the administrative record, however, plaintiff states that the amount is $188,821 attributable to Mad Dog and $45,517 attributable to Mica, for a total of $234,338. Pl.'s Mot. at 26. In its response and cross-motion, without further explanation, the government includes both inconsistent totals at different places. *See* Def.'s Cross-Mot. at 29-30. Then in its response, plaintiff appears to misquote the government's brief, identifying the total as $354,338. Pl.'s Reply at 23 (quoting incorrectly Def.'s Cross-Mot. at 30). The government again uses the original figure of $254,338 in its reply. Def.'s Reply at 16. As the parties' filings do not acknowledge these discrepancies, they appear to be the consequence of scrivener's errors, and the court will proceed on the basis that the appropriate figures are those originally included in the complaint, totaling $254,338.

both properties (neither of which, he concluded, was under audit).  *See* AR 71-1132 to 1133.
Turning to the Mica property, he noted that it had not been covered by any of the tolling
agreements, such that, after applying a six-year adjustment period from the February 2014 refund
request date, the first month within the time eligible for refund was January 2008.  *See* AR 71-
1133 to 1134.  Because the ONRR auditors had permitted refunds for production months in
2007, the Director concluded that BP must return those untimely requested refunds.  AR 71-
1133.  Similarly, the Director noted that, although covered by two tolling agreements, the Mad
Dog property was only tolled for a period of 260 days, meaning that "[b]ased on the date of BP's
2014 [d]emand—February 12, 2014—the extended adjustment period reached back to May 28,
2007," but ONRR had "granted the refund request for production months January 2007 through
March 2007."  AR 71-1133.  Thus, the Director concluded that BP must also return the Mad Dog
refunds for the production months January 2007 through March 2007.  *See* AR 71-1133.

    In their briefs, the parties focus their attention respecting the Mica and Mad Dog
properties primarily on BP's secondary argument that the Director's decision ordering repayment
of the refunds constituted a demand barred by the seven-year statute of limitations.  *See* Pl.'s
Mot. at 26; Def.'s Cross-Mot. at 28-30.  But those arguments are rendered irrelevant by the
court's conclusion that demands respecting unaudited costs are subject to the seven-year
limitation period of Subsections 1721a(b) and 1724(b), which extends the refund period for the
Mica and Mad Dog properties until at least the beginning of 2007, covering all the disputed
amounts.  ONRR initially applied the seven-year limit and appropriately acquiesced to BP's
demands for a refund of costs associated with Mica and Mad Dog from that time.  But, while
acknowledging that the relevant costs were not under audit, the Director's decision concerning
Mica and Mad Dog erred by reversing ONRR and applying the six-year adjustment period to
unaudited costs.  Application of the seven-year period leads to the conclusion that BP's refund
demands were timely and appropriately granted by ONRR.  Consequently, the Director erred in
ordering BP to repay the $254,338 refund associated with the Mica and Mad Dog properties.

### D.  BP's Eligibility for Interest on Overpayments

    As enacted by the Royalty Simplification Act, Subsection 1721(h) required that interest
"be allowed and paid or credited on any overpayment, with such interest to accrue from the date
such overpayment was made."  30 U.S.C. § 1721(h) (2012).  In 2015, the FAST Act eliminated
that provision for interest, stating simply that Section 1721 was amended "by striking
[S]ubsection[] (h)."  FAST Act § 32301.  BP's overpayments were made prior to the 2015
enactment of the FAST Act, and, in addition to the refund of overpayments, BP claims that it is
entitled to interest "that accrued from the time that BP made the royalty overpayments through
the date on which [the Department of] Interior has refunded the overpayments."  Pl.'s Mot. at 27.
The government does not dispute BP's right to recover interest that accrued before the effective
date of the FAST Act on December 4, 2015.  *See* Def.'s Cross-Mot. at 32.  The government
contends, however, that the FAST Act eliminated ONRR's authority to pay interest after
December 4, 2015, such that no further interest could accrue after that time.  *See id.*

    BP supports its position by reference to the Federal Savings Statute, 1 U.S.C. § 109.  *See*
Pl.'s Mot. at 27-28.  In relevant part, the Federal Savings Statute provides that—

> [t]he repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability.

1 U.S.C. § 109.  First enacted in 1871 to override the common law rule that presumptively eliminated statutory liabilities upon a statute's repeal, *see Stauffer v. Brooks Bros. Group, Inc.*, 758 F.3d 1314, 1321 n.3 (Fed. Cir. 2014); *see also Warden v. Marrero*, 417 U.S. 653, 660 (1974), the Federal Savings Statute establishes "a rule of construction . . . to be read and construed as a part of all subsequent repealing statutes, in order to give effect to the will and intent of Congress," *Hertz v. Woodman*, 218 U.S. 205, 217 (1910) (citations omitted); *see also United States v. Reisinger*, 128 U.S. 398, 401 (1888).   BP asserts that the FAST Act—far from expressly providing that it applies retroactively to overpayments made prior to its enactment—is simply silent on the matter of retroactive application, and thus the background principle of the Federal Savings Statute functions to preserve the continuing accrual of interest on obligations incurred prior to the effective date of the FAST Act.  Pl.'s Mot. at 28.  BP bolsters its argument against retroactive application by noting the contrast that "where it intended to do so, Congress explicitly made other provisions of the FAST Act retroactive." *Id.*[23]

The disputed issue regarding interest is thus whether the FAST Act prospectively cut off the continued accrual of interest after its enactment.  Building on the foundation of the Federal Savings Statute, BP cites two cases in support of its assertion that interest on preexisting obligations continued to accrue even after enactment of the FAST Act.  *See* Pl.'s Mot. at 29-31.  First, it points to the Supreme Court's decision in *De La Rama S.S. Co. v. United States*, 344 U.S. 386 (1953).  *Id.  De La Rama* held that the Federal Savings Statute operated, after repeal of the statute that had created a disputed liability, not only to preserve the liability at issue but also the jurisdictional provisions that the repealed statute had created to enforce liabilities incurred thereunder.  *Id.* at 389-90.  The enforcement mechanism and the liability itself were, the Court held, "part and parcel" of the same congressional objective.  *Id.* at 390.  Likewise, BP asserts, "the Federal Savings Statute saves *both* the government's liability for interest on overpaid royalties made prior to the FAST Act *and* the means to satisfy that liability."  Pl.'s Mot. at 29 (emphasis in original).

Second, BP cites *Korshin v. Commissioner*, 91 F.3d 670 (4th Cir. 1996), where the Fourth Circuit had occasion to address the Federal Savings Statute as it applied to a repealed

---

[23]This argument is reminiscent of a familiar canon of statutory interpretation, *expressio unius est exclusio alterius*, namely, the assumption that "expressing one item of a commonly associated group or series excludes another left unmentioned."  *United States v. Vonn*, 535 U.S. 55, 65 (2002).  The canon is a helpful interpretive aid but is not always apt and serves "only [as] a guide, whose fallibility can be shown by contrary indications that adopting a particular rule or statute was probably not meant to signal any exclusion of its common relatives."  *Id.* (citations omitted).  Nonetheless, the compelling and undisputed suggestion here is that by explicitly making certain provisions retroactive, Congress intended by its silence elsewhere in the same statute to act only prospectively.

statutory provision allowing the accrual of interest.  Pl.'s Mot. at 30-31.  *Korshin* involved a provision of the Internal Revenue Code which required the payment of interest on negligently underpaid taxes.  *See* 91 F.3d at 672.  That provision specified that interest would accrue from the date the tax was due until either the date of assessment or payment, whichever occurred first, but Congress repealed the provision in 1988.  *See id.* at 674.  The Fourth Circuit rejected Korshin's argument that interest on his underpayments between 1983 and 1987 should have stopped accruing in 1988, upon repeal of the interest-authorizing provisions.  *See id.* at 674-75.  The court first concluded that the repealing act did not "specifically provide[] for the extinguishment of existing liabilities for negligent underpayment."  *Id.* at 674.  Reasoning from that premise, the court applied the Federal Savings Statute to determine that liabilities under the repealed version of the statute must be preserved, and to do so "the interest portions . . . must be given their full value as prescribed by the statute; the interest must therefore begin and stop accruing as the statute[] specified."  *Id.* at 674-75.  BP contends that "[t]he Federal Savings Statute compels the same result in this case—the interest on royalty overpayments that BP made prior to the effective date of the FAST Act began accruing from the date of overpayment and continued to accrue until the overpayment is recovered."  Pl.'s Mot. at 31 (quotations omitted).

The government counters that the legislative history of the FAST Act and principles of sovereign immunity pose obstacles to the continued accrual of interest after 2015, and it attempts to dismiss each of BP's arguments in turn.  *See* Def.'s Cross-Mot. at 32-37.  The court finds these arguments unpersuasive.  Almost as a starting point, the government posits that "the FAST Act's legislative history confirms that the limited effect of [Sub]section 1721(h)'s repeal was to end *the accrual* of any overpayment interest after December 3, 2015."  Def.'s Cross-Mot. at 33.  In support of that conclusion, it proceeds through a series of ostensibly supporting sources, including Department of Interior budget justifications, Office of Management and Budget submissions to Congress, a conference committee report, and a Congressional Budget Office projection.  *See id.* at 33-35.  But "a court's proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself . . . . [and where] that examination yields a clear answer, judges must stop."  *Food Marketing Inst. v. Argus Leader Media*, __ U.S. __, __, 139 S. Ct. 2356, 2364 (2019) (citations omitted).  "[C]lear evidence of congressional intent may illuminate ambiguous text," but ambiguous legislative history can never be used "to muddy clear statutory language."  *Milner v. Department of Navy*, 562 U.S. 562, 572 (2011).  Here, the government's resort to legislative history disregards the statutory backdrop of the Federal Savings Statute.  The Federal Savings Statute establishes an interpretive premise that has to be applied by the interpreter; the result produced here is that absent any express repeal of existing liabilities and the related interest accrual provisions, Congress left those provisions intact.  The proffered legislative history would be used to develop inferences that would create ambiguity where there is none.

The government then asserts that the FAST Act "withdrew the waiver of sovereign immunity as to the accrual of interest."  Def.'s Cross-Mot. at 36.  While it correctly notes that the sovereign may not be subjected to suit without an express waiver of immunity, that such waivers must be construed strictly and narrowly, and that ambiguity must be resolved in favor of the sovereign, *see id.*, the government mistakenly severs the interest obligation from the wavier of sovereign immunity.  The Federal Savings Statute does "not merely save from extinction a liability incurred under the repealed statute; it save[s] the statute itself."  *De La Rama S.S. Co.*,

344 U.S. at 389. Thus, Subsection 1721(h) represented an express waiver of sovereign immunity, and the Federal Savings Statute functioned to preserve that waiver as it existed when Congress prospectively repealed the provision in 2015. Indeed, it is difficult to conceive how the Federal Savings Statute could have "saved the statute itself" without preserving the immunity waiver. *See id.* As in *De La Rama*, where recovery of obligations due was premised on the associated grant of jurisdiction and both were preserved by the Federal Savings Statute, *see* 344 U.S. at 390, so here the recovery of interest obligations is premised on a waiver of sovereign immunity. Thus, while the FAST Act eliminated government liability for interest on obligations incurred *after* its enactment, not those incurred before, it did not implicitly remove its previous express waiver of immunity. The government is manifestly correct that "interest cannot be recovered in a suit against the [g]overnment in the absence of an express waiver of sovereign immunity from an award of interest," Def.'s Reply at 17 (quotation omitted), but it fails to recognize that Section 1721(h) did waive immunity, and its repeal, in light of the Federal Savings Statute, did nothing to withdraw that waiver. Likewise, contrary to the government's contention, the fact that interest here is compounding does not somehow daily create a new liability. *See* Def.'s Cross-Mot. at 37. The compounding nature of the interest is "part and parcel" of the underlying obligation, integral to the statute as it originally existed, and in no way changes the analysis. *See De La Rama*, 344 U.S. at 390.

The government seeks to undermine BP's reliance on *Korshin* by distinguishing it in several respects. First, it claims that *Korshin* involved interest owed to, rather than by, the United States, and for that reason did not implicate the same issues of sovereign immunity. *See* Def.'s Cross-Mot. at 37. As already noted, however, sovereign immunity does not pose the barrier the government would establish. Second, the government emphasizes that the statute in *Korshin* explicitly stated that interest would accrue until the date of payment, and thus was unaffected by the repeal in light of the Federal Savings Statute, whereas Subsection 1721(h) did not specify the end date of the accrual and as such there was nothing to preserve in that regard. *See* Hr'g Tr. 68:24 to 71:11. This difference does not, however, carry as much weight as the government supposes. Significantly, the statute in *Korshin* did not merely specify that interest would accrue until the date of payment; rather, it provided that interest would accrue until the earlier of two possible events occurred—the assessment date or the payment date. *See Korshin*, 91 F.3d at 674. One generally assumes that interest accrues until the date the underlying obligation is satisfied, unless some other date or cut-off event is specified. The need to clarify, as in *Korshin*, only arises when other alternatives are available. The statute here being silent on the matter, no evident date other than that of payment presents itself. By silence, the statute implicitly assumes that interest will accrue until the underlying obligation is paid, and the government presents no basis to suspect that Congress would have understood it differently when it declined to expressly cut off interest accrual on previously incurred obligations when it enacted the FAST Act. Indeed, the government acknowledges that, prior to repeal, "ONRR could [and did] reasonably interpret [Subs]ection 1721(h) to require the accrual of interest until the return of overpayment principal, inasmuch as no statutory language prescribed when accruals ended or otherwise limited future accruals." Def.'s Reply at 18. The court agrees. Moreover, if it was a reasonable interpretation of the statute before repeal, the government proffers no compelling reason why that understanding of the statute—which was preserved by the Federal Savings Statute—would cease to be reasonable after repeal.

**CONCLUSION**

For the reasons stated, BP's motion for judgment on the administrative record is GRANTED and the government's cross-motion is DENIED.  BP is awarded judgment for $1,536,785 ($1,282,447 plus $254,338), as well as interest on all unpaid refunds computed "at the rate obtained by applying the provisions of subparagraphs (A) and (B) of section 6621(a)(1) of Title 26, but determined without regard to the sentence following subparagraph (B) of section 662(a)(1)," 30 U.S.C. § 1721(h) (2012), applied continuously until the judgment is paid.  The clerk shall enter judgment accordingly.

BP is awarded its costs of suit.

It is so **ORDERED**.

<u>s/ Charles F. Lettow</u>
Charles F. Lettow
Senior Judge